DECISION
This matter is before the Court for decision following a nonjury trial on Plaintiff's complaint. Essentially, Plaintiff herein is seeking a declaratory judgment regarding her claimed right to receive lifetime pension benefits irrespective of her remarriage.[1] At the trial, thirteen joint exhibits were introduced into evidence and three witnesses testified (Plaintiff, Defendant — Barry Yeaw, and Francis A. Frobel — the Town Manager of Coventry). Thereafter, both parties submitted their post-trial memoranda of law.
The following facts were undisputed at trial:
 1. Irene (Palo) Donahay (hereinafter referred to as Plaintiff), is the widow of Jack William Palo who, until the time of his death on April 1, 1984, was employed as the Chief of Police for the Town of Coventry and had been so employed since September 18, 1978.
 2. The Town of Coventry, pursuant to Public Laws 1970, Chapter 229 and Article IV of the Coventry Code — entitled Police Retirement Plan (hereinafter referred to as The Plan), adopted a pension plan for the benefit of police officers employed by the Town of Coventry. [See Joint Exhibit A].
 3. The Plan vested its overall operation and administrative responsibilities in the Police Pension Committee (hereinafter referred to as the Committee) which consists of three members appointed by the Coventry Town Council.
 4. The Plan was in effect at the time of Jack Palo's death.
 5. On May 4, 1984, the Committee, which consisted of then Town Manager Ronald W. Owens, then Assistant Town Solicitor Walter F. Richardson, III, Esquire, and then Coventry Police Captain Stan Leach, held a meeting, the purpose of which is reflected in Joint Exhibit B.
 6. In June of 1984, the Bankers Life Company [which according to the undisputed testimony was succeeded by the Principal Financial Group] (hereinafter referred to as the Agent) was the administrating agent of The Plan.
 7. The Agent, on July 18, 1984, notified the Department of Administration, Inheritance Tax Section, of the State of Rhode Island that [monthly] payments in the amount of $546.79 would be paid to Plaintiff as beneficiary under The Plan.
 8. The benefits paid to Plaintiff under The Plan were terminated on or about August 1, 1993.
 9. Plaintiff remarried on April 14, 1993.
 10. There are no minutes of a Committee meeting other than as included in the joint exhibits.
ESTOPPEL
In her testimony and in her pre-trial and post-trial memoranda, Plaintiff averred that she reasonably and understandably relied to her detriment on certain communications made purporting to establish that she would, if she remarried, continue to receive benefits under the Plan for the rest of her life. Specifically, Plaintiff alleges that she relied upon: (1) the minutes of a Committee meeting which occurred May 4, 1984 [Joint Exhibit B]; (2) the contents of a June 14, 1984 letter sent to her from the Agent of the Plan [Joint Exhibit C]; (3) the contents of another document dated July 18, 1984 and addressed to the Rhode Island Division of Taxation from the Agent [Joint Exhibit D]; and (4) a conversation she had with Defendant Barry Yeaw. Of note, Plaintiff further alleges that she signed a pre-nuptial agreement with her present husband while thinking she was entitled to this independent source of income for life; she testified that although she planned to marry her current husband regardless of whether her benefits continued, she would never have agreed to the terms therein (allegedly waiving her right to receive support from her current husband) had she not been so misled. (Tr. at 6, 10-11). As a result of this detrimental reliance,[2] Plaintiff claims that Defendants should be estopped from denying her the benefits in question. For the following reasons, this Court cannot accept her estoppel argument.
Plaintiff first argues that in Joint Exhibit B, a properly-constituted Committee unanimously determined that she was a beneficiary under the Plan, and that pursuant to § 10(6) of said Plan, this has the effect of a final decision. (See
Plaintiff's Pre-trial Statement, p. 2-3). The Court notes, however, that Joint Exhibit B does not directly speak to this issue nor does it mention anything about Plaintiff receiving benefits for life; it merely explains how she potentially could qualify for pension benefits.[3] See Joint Exhibit B; seealso Joint Exhibit F (a May 11, 1984 letter from then Town Manager Ronald Owens to Plaintiff). Hence, any reliance on this document is wholly misplaced.
Plaintiff next points to the language utilized by the Agent in Joint Exhibits C and D, noting that each exhibit states she would be receiving benefits from the Plan as long as she lives.[4] (Tr. at 8, 11-12). Joint Exhibit C further states, however, that the Agent will "make future payments in accordance with the terms of the group contract. . . ." Section 8(4) of the Plan provides as follows:
 "If a retired member . . . is survived by a widow . . . she will be entitled to a pension payable for life. . . . Such a survivor's pension will be payable monthly until the earlier of: (a) [t]he widow's remarriage; or (b) [t]he widow's death. . . ."
This language clearly and unequivocally indicates that by reason of Plaintiff's remarriage, she is no longer eligible for benefits under the Plan. Therefore, these documents sent by the Agent simply cannot create, for the benefit of Plaintiff, an entitlement to lifetime pension benefits when the Plan plainly does not.[5]
Finally, Plaintiff asserts that in late 1991 or early 1992, before she signed the pre-nuptial agreement and married her current husband, she inquired of the Coventry Town Treasurer, Barry Yeaw, if remarriage would affect her pension.[6] (Tr. at 5-6). According to Plaintiff, Yeaw informed her that she would, in fact, continue to receive benefits for the rest of her life, regardless of her remarriage. It was then, after this conversation, that Plaintiff allegedly notified the Agent of her remarriage. Defendant, Barry Yeaw, on the other hand, testified that the conversation took place in the early Spring of 1993. (Tr. at 13). More importantly, he stated that when Plaintiff told him she was thinking of remarrying and asked about the meaning of the aforementioned language in Joint Exhibit D, he replied that although, on its face, that document appeared to grant Plaintiff benefits for life, he really did not know, and that it would have to be checked. (Tr. at 14-15). According to Yeaw, he then gave her an old pension booklet and suggested she contact the Agent. (Tr. at 15). Even assuming arguendo that Plaintiff's version of the conversation is accurate, Plaintiff nonetheless cannot successfully claim estoppel because Yeaw, as Town Treasurer, had no authority to make a promise upon which she might reasonably rely. See Mancuso v. City of Providence, 685 A.2d 279, 279-80 (R.I. 1996) (memorandum decision); see also Eugene McQuillin,The Law of Municipal Corporations § 12.126.10 (3d ed. 1990).
This leads the Court to an analysis of this case under general estoppel principles. To prevail under a theory of estoppel, Plaintiff must show that Defendant, by some affirmative conduct or representation, intentionally induced her to act, or fail to act, in detrimental reliance on that conduct or representation. Martinelli v. Travelers Ins. Cos.,687 A.2d 443, 447 (R.I. 1996) (citing Raymond v. B.I.F. Industries,Inc., 112 R.I. 192, 198, 308 A.2d 820, 823 (1973)). More importantly to the instant case:
 "There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgement than the product of what defendant did or represented. The act must be induced by, and be the immediate or proximate result of, the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on. The representation or conduct must of itself have been sufficient to warrant the action of the party claiming the estoppel. If notwithstanding such representation or conduct he was still obliged to inquire for the existence of other facts and to rely on them also to sustain the course of action adopted, he cannot claim that the conduct of the other party was the cause of his action and no estoppel will arise. . . ." Zitelli v. Dermatology Educ. Research Found., 633 A.2d 134, 139-40 (Pa. 1993) (citing In re Estate of Tallarico, 425 Pa. 280, 288-89, 228 A.2d 736, 741 (1967)).
In the opinion of this Court, Plaintiff has not established by a preponderance of the evidence that a communication was made to her sufficient to support a claim of estoppel. Plaintiff's testimony that she relied on the aforementioned exhibits and the disputed statement by Barry Yeaw is substantially undermined by the fact that she did not ask for or review the Plan nor knew of its existence; she never spoke to her lawyer about it, though he reviewed her pre-nuptial agreement; she did not ask the Town Treasurer to confirm, in writing, what she contends, and he denies, that he said; and she did not seek confirmation from the Town. (Tr. at 9-10). Furthermore, as Defendants point out, the fact that Plaintiff went to the Town Hall and questioned Mr. Yeaw indicates she had at least some doubt as to the continuation of benefits after remarriage, and this discounts her reliance on Joint Exhibits B, C, and D. Consequently, for these reasons, and for those hereinbefore set forth, Plaintiff's estoppel argument must fail.
ALLEGED PROCEDURAL VIOLATIONS
Although the gravamen of Plaintiff's action sounds in estoppel, Plaintiff also advances two procedural arguments. First, relying primarily on § 10(5) of the Plan,[7] Plaintiff contends that her benefits were wrongfully terminated because the required vote was not taken nor was a record kept. Moreover, Plaintiff avers that her benefits were terminated by an improperly-constituted Committee. As to this argument, the Court finds that, in light of the clear language of § 8(4), compliance by the Committee in this case would amount to a purely ministerial act. See Malinou v. Kiernan, 103 R.I. 85, 90-91,235 A.2d 105, 109 (1967).
Plaintiff also cites to § 12(1) of the Plan in claiming that even a properly-constituted Committee could not terminate her benefits without her consent. In pertinent part, this paragraph states:
 "the Town reserves the right at any time to terminate this plan or to modify or amend this plan and agreement in any respect whatsoever, whether prospectively or retroactively, provided that, . . . no such modification or amendment shall reduce the amount in which a . . . beneficiary has a vested interest under the plan immediately prior to such modification or amendment, without the consent of such . . . beneficiary."
The Court, again referring back to § 8(4) of the Plan, notes that Plaintiff possessed a vested interest in pension benefits subject to immediate and complete divestment upon her remarriage. Moreover, as Defendants' point out, this paragraph concerns the Town's ability to terminate, modify, or amend the Plan itself, not benefits due thereunder. Accordingly, this paragraph of the Plan is also of no avail to Plaintiff.
The Court has considered the testimony elicited at trial and has carefully examined and reviewed the memoranda submitted by the parties. After due consideration, the Court finds and declares that Plaintiff is not entitled to the relief that she seeks.
Counsel for the prevailing party shall submit an appropriate judgment for entry.
[1] Plaintiff also seeks the restoration of pension benefits allegedly due her retroactive to the date her benefits were terminated, plus interest, attorney's fees, and costs.
[2] On this issue, the Court notes that the pre-nuptial agreement was not introduced into evidence. Moreover, as Defendants point out, Plaintiff testified that she could still work and support herself if necessary, and that she had not asked her husband to alter the agreement. (Tr. at 11). Defendants also note that no evidence was presented that Plaintiff's current husband was not supporting her now and would not continue to do so.
[3] Apparently, when Plaintiff's late husband, Chief Palo, died, his rights had not yet vested in the Plan. However, Plaintiff was ultimately offered the opportunity to receive pension benefits by, inter alia, purchasing the Chief's military service time.
[4] Joint Exhibit C states, in pertinent part, that "[f]uture checks . . . will be sent to you . . . as long as you live."
Joint Exhibit D, which the Court notes was addressed to the Rhode Island Division of Taxation and not to Plaintiff, provides that the Agent was to pay Plaintiff "$546.79 a month as long as . . . she lives."
[5] On a related point, the Court notes that the Agent has no authority to alter or modify said Plan, and a municipality cannot be bound by the actions of an agent without actual authority.See Providence Teachers Union v. Providence Sch. Bd.,689 A.2d 388, 391 (R.I. 1997) (citing Warwick Teachers' Union v.Warwick Sch. Comm., 624 A.2d 849, 851 (R.I. 1993)).
[6] Plaintiff testified that she did so only because she is a thorough person; she still maintains the aforementioned letters were sufficient. (Tr. at 9).
[7] Section 10(5) of the Plan states that "[t]he committee may decide any questions hereunder and may take or approve the taking of any action hereunder by vote of a majority of the committee at a meeting and recorded in the records of the meeting."