WARWICK TEACHERS' UNION LOCAL
NO. 915, AFT, AFL–CIO

v.

WARWICK SCHOOL COMMITTEE.

No. 92–431–M.P.

Supreme Court of Rhode Island.

May 12, 1993.

William R. Powers, III, James M. Green, Powers, Kinder & Keeney, Providence, for plaintiff.

Richard Skolnik, Lipsey & Skolnik, Providence, Thomas Liguori, Jr., Westerly, for defendant.

OPINION

WEISBERGER, Justice.

This case comes before us on a petition for certiorari filed by the Warwick Teachers' Union, Local No. 915, AFT, AFL–CIO (union), to review a judgment entered in the Superior Court reversing a decision by the Rhode Island State Labor Relations Board (board), which held that the Warwick School Committee (committee) had committed an unfair labor practice in refusing to execute a collective-bargaining agreement allegedly agreed to orally by the negotiating representatives of both parties on September 10, 1991. We affirm the judgment of the Superior Court. The facts of the case insofar as pertinent to this petition for certiorari as found by the board are as follows.

On or about March 19, 1991, the union and the committee began negotiations in an attempt to arrive at a new collective-bargaining agreement that would govern conditions of employment between the union and the committee beginning September 1, 1991. This agreement would replace an existing collective-bargaining agreement that was due to expire August 31, 1991. Each party had appointed a negotiating team. The chief negotiator for the union was Edward J. McElroy, Jr. (McElroy), who was president and chief executive officer of the Rhode Island Federation of Teachers and also served as executive secretary of the union involved in this negotiation. The negotiators who had been appointed to represent the committee were Jane Austin (Austin), a first-term member of the committee; Robert H. Quinlan (Quinlan), who had served for a number of years on the committee; and Robert D. Watt, Jr., Esquire (Watt), who had served as legal counsel for the committee and was designated as the spokesperson of the committee's team.

At the first negotiation meeting that took place March 19, 1991, the negotiating teams for both parties agreed upon certain ground rules of which item 6 provided as follows:

"6. When tentative agreement is reached on any material, it will be so initialed by the respective spokesmen. Agreement reached on individual items shall be tentative and contingent on total agreement."

Negotiation meetings were held on numerous dates between May 13, 1991, when the parties exchanged proposed contract changes and September 9–10, 1991, the date of the final negotiating session. In addition mediation sessions were held on various dates in an effort to resolve the terms of the proposed new collective-bargaining agreement. During the many months of negotiations, most of the issues had been resolved, but at no time did the parties write out or initial such agreements as required by item 6 of the ground rules.

On or about September 4, 1991, when agreement on a number of significant issues had not been reached, the members of the union went on strike. Key issues still unresolved were the salary schedule, personal days, class size, the number of periods in the high school day, health care, layoffs, and temporary leave.

Negotiating sessions were held on September 5, 6, and 8, and a final session began on the evening of September 9 in the office of the mayor of Warwick at about 7 p.m. This bargaining session concluded at the union office at approximately 7:30 a.m. on September 10, 1991. From the testimony that was given before the board it appears that the committee's negotiators were authorized to reach agreement on all outstanding issues except for two major points in dispute. The committee had agreed to abolish certain types of leaves of absence that had been authorized in the prior collective-bargaining agreement in exchange for granting to all members of the union one additional personal day. Watt was expressly instructed to agree to no more than one personal day.

Another unresolved issue was a committee proposal to eliminate the weighting of certain learning-disabled children as one and a half or two students in determining the contractual limits on class size. The committee's negotiating team had been authorized to agree to the payment of additional compensation to a teacher beginning with the twenty-seventh student in a class. According to the uncontradicted testimony, Watt was specifically instructed not to agree to additional payments for students in a class less than the twenty-seventh student.

Nevertheless, early in the morning of September 10, 1991, Watt purported to agree with McElroy outside the presence of Quinlan and Austin to make a double payment beginning with the twenty-sixth student in a class and extending to the twenty-eighth student and to allow a third personal day for each teacher.

There seems little doubt that McElroy believed that he had the agreement of Watt on these two contract issues. Austin testified that she did not assent to the Watt–McElroy agreement. It appears that Quinlan was not present during the discussion of these two issues. The board drew adverse inferences against the committee since Watt and Quinlan did not testify. Nevertheless, the uncontradicted testimony on the record before the board was that Watt and his fellow negotiators had never been authorized to agree to a third personal day or to additional compensation beginning with the twenty-sixth student.

The board held, however, as a matter of law that the provisions of G.L.1956 (1986 Reenactment) §§ 28–9.3–3 and 28–9.3–4 require the committee to grant plenary authority to its negotiating representatives in order to achieve good-faith bargaining. The board determined as a matter of law that the committee's negotiating team "did have authority to bind it" and did so when Watt and Austin agreed to a double payment for the twenty-sixth student. The board found as a fact that Austin had signified her assent even though she testified to the contrary. The board believed that the negotiating team appointed by the committee had authority to bind it, regardless of instructions that may have purported to limit the team's authority.

On appeal a justice of the Superior Court disagreed with this legal principle. She held that the authority of a public agent to

bind a municipality must be actual, citing *School Committee of Providence v. Board of Regents for Education*, 429 A.2d 1297 (R.I.1981), and the general principle enunciated in 2 *Williston on Contracts* § 305 at 414–23 (Jaeger 3d. ed.1959). She noted that three witnesses presented by the committee, Austin, Harold Knickle, and Walter Constantine, all testified without contradiction concerning instructions given to Watt that limited his authority to agree to no more than one additional personal day and not to agree to payment of additional compensation for the twenty-sixth student in a class. The Superior Court justice held that the delegation of authority by the school committee to the negotiating committee to reach agreements must be actual. She therefore held that the board's conclusion was erroneous as a matter of law and that the concept of apparent authority was not applicable to negotiations with representatives of municipalities. With this determination we agree. In so holding, she exercised the authority accorded to her by G.L.1956 (1988 Reenactment) § 42–35–15.

This case presents one single issue of law, namely, whether one or more members of a negotiating team may bind a school committee in contravention of specific instructions limiting their authority. We hold that the answer to this question must be given in the negative. In *School Committee of Providence* we held without equivocation that the authority of a public agent to bind a municipality must be actual. "Consequently, any representations made by such an agent lacking actual authority are not binding on the municipality or its delegate the school committee." 429 A.2d at 1302.

The union argues in its brief that this principle enunciated in a context of purported hiring by a school principal should not be applied to the negotiating of a collective-bargaining agreement. The union presents an argument that negotiators must be given complete authority to bind their principal if bargaining in good faith is to be effective. We find this argument to be unpersuasive. It is undisputed that in over twenty years of negotiations between the Warwick School Committee and the teachers' union, each tentative agreement reached by the negotiators has been presented for ratification both to the school committee and to the members of the union. It is unnecessary for this court to determine in this case whether contract terms agreed to by negotiators within the scope of their authority need to be presented to the principals for ratification. We do not hold that a school committee whose specific instructions to its negotiating team have been followed would have the authority to reject an agreement reached by its representatives pursuant to that authority. We hold only, as did the justice of the Superior Court, that a negotiating representative may not bind the committee if he or she exceeds the specific authority accorded to him or her by the committee.[1]

We have examined the numerous citations to decisions given by the National Labor Relations Board pursuant to § 8 of the National Labor Relations Act, 29 U.S.C. § 158(d), and this examination discloses no principle that an employer is required to give unlimited authority to a negotiating representative or be guilty of an unfair labor practice. *See Lloyd A. Fry Roofing Co. v. NLRB*, 216 F.2d 273 (9th Cir.1954). It is true that the degree of authority given to employer representatives may be considered in evaluating whether good-faith bargaining has taken place. In the case at bar

1. We recognize that in this state there has been a long tradition of presenting public-sector collective-bargaining agreements to the principals for ratification after the negotiating representatives have reached a tentative agreement. Collective-bargaining negotiations, particularly when the parties engage in round-the-clock discussions, may cause negotiators to seek a compromise beyond the scope of prior instructions. In such circumstances we believe that submitting the tentative contract both to the union and to the municipal authority for ratification does not constitute an unfair labor practice. This is the only way that the members of the union on the one hand and the municipal authority (school committee or other municipal governing body) on the other may pass upon the recommendations of their negotiating agents. In teacher contracts the school committee, like the members of the union, must make the final determination regarding whether an agreement has been reached.

significant authority had been granted to the negotiating team to agree on a great variety of unresolved issues. However, the line was clearly drawn on the issue of a third personal day and additional compensation beginning with the twenty-sixth student. Neither Watt nor any other member of the team had the authority to ignore these instructions. We believe that the union's argument concerning apparent authority and estoppel is without merit.

■ Both the union and the board have argued that the committee had an obligation to reduce the oral agreement to a written contract under our mandate in *Warren Education Association v. Lapan,* 103 R.I. 163, 235 A.2d 866 (1967). We conclude, as did the trial justice, that this case has no applicability to the instant controversy. Since the negotiating representatives had no actual authority to reach an agreement on two major issues, no oral agreement was effectively concluded pursuant to the provision of ground rule 6. Therefore, no oral agreement was reached between the parties, and there was no obligation to execute a written contract.

For the reasons stated, the petition for certiorari is hereby denied. The judgment of the Superior Court is affirmed. The writ heretofore issued is quashed. The papers in the case may be remanded to the Superior Court with our decision endorsed thereon.