Paul E. ROMANO

v.

The RETIREMENT BOARD OF THE
EMPLOYEES' RETIREMENT SYS-
TEM OF THE STATE of Rhode Is-
land.

No. 99–394–M.P.

Supreme Court of Rhode Island.

Feb. 19, 2001.

Robert H. Friel, Warwick, for Plaintiff.

David D. Barricelli, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

■ Did a retired state employee's detrimental reliance on advice given to him by agents of the State Retirement Board (board)—advice that was contrary to state law—estop the board from suspending the retiree's pension when it discovered he was also working full-time for a municipality? Because the alleged representations relied upon were *ultra vires* and in conflict with state law, we answer this question in the negative. Therefore, we affirm that portion of the trial justice's ruling holding that the doctrine of equitable estoppel did not preclude the board from suspending future retirement payments to the plaintiff, Paul E. Romano (Romano). We quash, however, the trial justice's *sua sponte* order of restitution (requiring Romano to reimburse the state for pension benefits he received but which he was not entitled to under state law) because there was insufficient evidence to determine, as a matter of law, whether it was equitable in these circumstances to require restitution.

## Facts and Travel

Romano worked as an engineer for the Rhode Island Department of Transportation (DOT) for twenty-five years. As a state employee, he was a member of the state's Retirement System (system). In 1989, the Governor announced an early retirement incentive package for state employees that significantly enhanced retirement benefits for those who chose to participate. In addition to other incentives, the package offered participants an additional 10 percent service credit and a more favorable salary basis upon which retirement benefits would be calculated (under the package, retirement benefits would be based upon the participant's previous twelve-month salary, rather than the three-year salary average generally used). *See* P.L.1989, ch. 126, art. 43, § 1.

At the time of the Governor's announcement, the then-administrator of the Town of Bristol (town), Halsey Herreshoff (Herreshoff), approached Romano and offered him a position as the town's director of public works. Contemplating this offer, but concerned about its potential impact on his retirement benefits, Romano spoke to a retirement counselor from the system. She told him that, although she knew of no restrictions, if he "wanted to stay out of trouble" he should "go to the retirement board." Thereafter, acting on Romano's behalf, Herreshoff allegedly contacted then-executive director of the system, Donald Hickey (Hickey), to confirm what the retirement counselor had told Romano. On July 25, 1989, Hickey sent a letter to Herreshoff and, without referring specifically to Romano or to Romano's particular situation, he stated his general understanding of the board's policy "concerning people working for a municipality after retirement from State service without penalty." He wrote, "[s]ince the municipal system is a different system and only administered by us, there is no prohibition against a state retiree working for and belonging to a municipal system." He gave no further details or advice concerning the statutory restrictions and conditions governing such reemployment but offered "[i]f further clarification is needed please let me know."

Romano claims to have understood this letter as one that specifically addressed his case. As a result, he interpreted it to mean that he could simultaneously collect his state retirement pension and receive his full-time salary from the town. Almost immediately after receipt of Hickey's letter on July 25, 1989, and without making any further inquiries into potential limitations

and/or conditions that might restrict his reemployment, Romano retired from DOT. Shortly thereafter he accepted the full-time position as the town's director of public works and he began to receive both his municipal salary as a full-time employee of the town and his state retirement pension.[1]

According to the system, Romano's "double dipping" went unnoticed until 1996 when it was uncovered by an internal audit. Upon discovery of the error, the Retirement System informed Romano by letter, dated January 2, 1996, that because his municipal employment had exceeded the annual limit of seventy-five full days or 150 half days (the statutory limit imposed by G.L.1956 § 36–10–36), he would be ineligible to receive pension benefits, effective January 31, 1996. In a letter to Romano, dated January 18, 1996, the executive director of the system, Joann E. Flaminio (Flaminio), issued an administrative decision requiring Romano to "either comply with the 75 working-day limitation (or 150 half-day limitation) enunciated in § 36–10–36 or risk suspension of your pension benefits once the 75 day limit is exceeded." She also ordered him to "cease employment with the Town of Bristol as of April 17, 1996, of this year in order to continue to receive your current monthly pension payment."

Romano appealed Flaminio's administrative decision and the matter was assigned for a determination to an administrative hearing officer from the system. The system agreed to continue paying Romano his monthly pension pending a decision of the hearing officer. On November 18, 1996, however, the hearing officer affirmed Flaminio's decision, finding that, pursuant to § 36–10–36, Romano's full-time employment with the municipality disqualified him from receiving state pension benefits.

In an administrative appeal before the board on December 18, 1996, Romano argued that he had detrimentally relied upon the representations made by the retirement councilor and Hickey and that therefore he should be granted an equitable remedy. The board upheld the hearing officer's decision, concluding that "where there is a clear statutory mandate, [the board] must comply with [it], and * * * no government official can in fact waive that mandate." The board notified Romano of its decision by letter, dated December 20, 1996, and informed him that his pension benefits would be suspended effective December 31, 1996.

Romano appealed the board's decision to the Superior Court. On April 15, 1997, at Romano's request, that court issued a temporary restraining order enjoining the board from suspending Romano's monthly retirement benefits pending the outcome of his administrative appeal. The order noted that "[s]hould the Plaintiff's action be unsuccessful, the plaintiff may be obligated to reimburse the State of Rhode Island."

On June 29, 1999, the Superior Court upheld the board's decision and vacated the temporary restraining order, thereby allowing the system to suspend future retirement payments to Romano. In addition, the Superior Court ordered *sua sponte* that Romano "reimburse the State of Rhode Island for any benefits paid him to which he was not entitled."

# I

## Suspension of Future Pension Payments

■ Neither the facts of this case nor the applicable law barred the board from

---

1. The precise dates of Romano's retirement and reemployment are unclear from the record. The board asserts that Romano retired from DOT on July 29, 1989, and began employment with the town on July 31, 1989. Romano merely contends that his retirement and reemployment came "almost immediately" after Herreshoff received Hickey's letter on July 25, 1989. In a letter to Romano, dated January 18, 1996, from Joann E. Flaminio, the executive director of the system, Flaminio communicated her understanding that Romano retired on September 29, 1989, and that monthly retirement benefit payments to him began on that date.

suspending the payment of future pension benefits to Romano after it discovered in 1996 that he had been serving as a full-time municipal employee while he was also receiving pension benefits from the state.[2] Therefore, we affirm that portion of the Superior Court's judgment in this case, squarely on the grounds that the doctrine of equitable estoppel should not be applied against a governmental entity like the board when, as here, the alleged representations or conduct relied upon were *ultra vires* or in conflict with applicable law. *See State v. Rhode Island Alliance of Social Services Employees, Local 580, SEIU,* 747 A.2d 465, 469 (R.I.2000) (*Rhode Island Alliance*); *Rhode Island Brotherhood of Correctional Officers v. State Department of Corrections,* 707 A.2d 1229, 1237–38 (R.I.1998); *Technology Investors v. Town of Westerly,* 689 A.2d 1060, 1062 (R.I.1997); *Providence Teachers Union v. Providence School Board,* 689 A.2d 388, 391–92 (R.I. 1997) (*Providence Teachers II*); *Providence Teachers Union v. Providence School Board,* 689 A.2d 384, 388 (R.I.1996) (*Providence Teachers I*); *Warwick Teachers' Union Local No. 915 v. Warwick School Committee,* 624 A.2d 849, 851 (R.I. 1993); *School Committee of Providence v. Board of Regents for Education,* 429 A.2d 1297, 1302 (R.I.1981); *Ferrelli v. Department of Employment Security,* 106 R.I. 588, 593–94, 261 A.2d 906, 909–10 (R.I. 1970).

Here, at all times material to this case, applicable state law, § 36–10–36, required

that "[p]ension payments *shall* be suspended" (emphasis added) whenever any state retiree is reemployed by a municipality within the state for more than seventy-five working days per calendar year. Such legislation, we have held, "was both reasonable and necessary to advance the legitimate public purpose of fostering public confidence in the State's retirement system by restricting the proclivity of some public pensioners to indulge in what is colloquially referred to as 'double dipping'—that is, the simultaneous receipt by retired public employees of both a salary for state reemployment and a state pension." *Retired Adjunct Professors v. Almond,* 690 A.2d 1342, 1347 (R.I.1997). After Romano's retirement from state employment in 1989, he was reemployed by a municipality where he worked for more than seventy-five working days per calendar year. Thus, his pension payments from the state should have been suspended during each of those years. Instead, he continued to collect through 1999 both a full pension from the state and a full salary from the town while apparently failing to report his full-time municipal-employment status to the retirement board on a monthly basis as the law required him to do. *See* § 36–10–36(b) ("*Notice of employment shall be sent monthly to the retirement board* by the employer and *by the retired member*."). (Emphases added.)[3]

2. Although the board discovered Romano's full-time employment status with the town in 1996, the Superior Court enjoined its attempt to suspend his pension benefits (and thereby prevented it from doing so) until the conclusion of Romano's administrative-appeal proceedings in 1999. Thus, even after the board identified its mistake in paying Romano pension benefits from 1989 to 1996, it was obliged by a court order that Romano obtained in 1997 to continue paying these benefits to him until 1999 when the Superior Court entered its final judgment in favor of the board. Because the order itself provided that "should [Romano's] action be unsuccessful, [Romano] may be obligated to reimburse the State of Rhode Island," the equities of ordering Romano to reimburse the state for

the pension overpayments he received under this court order from 1997 to the 1999 entry of the Superior Court's judgment in favor of the board may well stand on a different footing with respect to any order of restitution than the payments Romano received from 1989 to 1996. In any event, we leave that determination for the Superior Court to make upon remand after ascertaining what Romano did with the extra pension money he received and whether he changed his financial circumstances in reliance upon his continued receipt of these excessive pension payments.

3. It may well be true, as the concurring and dissenting opinion (hereinafter, the dissent) contends, that Romano "committed no evil" when he feathered his retirement nest with

To cite just one recent example of a case where we have refused to estop a governmental entity when to do so would contravene state law, in *Technology Investors,* 689 A.2d at 1062, we held that a trial justice had erred in concluding that a municipality was estopped from claiming that its grant of a tax abatement was unenforceable. The town had granted the abatement to a business that had relocated to that town based upon the tax-abatement assurances of the town and its agents. *Id.* But we held that the abatement was unenforceable because it was contrary to state law and, therefore, the local government's representations and actions to the contrary were deemed *ultra vires. Id.* For this reason, the taxpayer was unable to estop the town from reneging on its tax-abatement promises merely because it had relied upon the town's actions and assurances to its financial detriment. *Id.* We ruled there that "[t]he significant policy that undergirds this rule [no municipal tax abatements for relocating businesses] cannot be set aside by estoppel." *Id.* As we noted again last term, "notions of promissory estoppel that are routinely applied in private contractual contexts are ill-suited to public-contract-rights analysis." *D. Corso Excavating, Inc. v. Poulin,* 747 A.2d 994, 1001 (R.I.2000) (quoting *Retired Adjunct Professors,* 690 A.2d at 1346). Indeed, in *Retired Adjunct Professors,* we observed that "courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis

of a contract or an estoppel." 690 A.2d at 1346 (quoting *Pineman v. Fallon,* 662 F.Supp. 1311, 1316 (D.Conn.1987), *aff'd,* 842 F.2d 598 (2d Cir.), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 48 (1988)). Most recently, we landed with an audible thud on separate attempts by two Johnston nightclubs to parlay alleged verbal assurances from individual government officials—supposedly approving of or immunizing their illegal conduct—into an equitable estoppel defense against the government's attempts to enforce the applicable law against the offending parties. *See Casa DiMario, Inc. v. Richardson,* 763 A.2d 607, 612–13 (R.I.2000); *El Marocco Club, Inc. v. Richardson,* 746 A.2d 1228, 1233–34 (R.I.2000).

■ Here, too, neither the retirement counselor nor the board's executive director possessed any actual or apparent authority to vary or contradict "a valid employment requirement prescribed by state law." *Rhode Island Alliance,* 747 A.2d at 468 (quoting *Pawtucket -School Committee v. Pawtucket Teachers' Alliance Local No. 930,* 652 A.2d 970, 972 (R.I.1995)). Although "in an appropriate factual context the doctrine of estoppel should be applied against public agencies to prevent injustice and fraud where the agency or officers thereof, *acting within their authority,* made representations to cause the party seeking to invoke the doctrine either to act or refrain from acting in a particular manner to his [, her, or its] detriment," *Ferrelli,* 106 R.I. at 594, 261 A.2d at 910 (emphasis added), neither a

---

over $100,000 in illegal public retirement benefits. But whenever possible, we prefer to leave judgments about the good or evil that men do to a much higher and infinitely more prescient court than this one. What we do know, however, is that Romano's deft "double dipping" was contrary to state law. And whether his conduct in arranging to receive this money is labeled good or evil, *malum in se* or *malum prohibitum,* the fact remains that, at the end of the day, he not only sought but also obtained tens of thousands of dollars in publicly funded retirement benefits that he was not entitled to receive. Thus, his moral

culpability in securing this illicit pension lucre is irrelevant to our legal condemnation of his actions. We hasten to add, however, that his behavior in obtaining and maintaining this illegal stream of pension bounty was hardly blameless. Thus, the dissent's heartfelt identification with Romano's pension plight tends to ignore or, at the very least, to minimize the extent to which Romano himself was responsible for obtaining these ill-gotten gains, and to undervalue the public benefit of recovering this money for the system to use in paying legitimate pension benefits to other retirees.

government entity nor any of its representatives has any implied or actual authority to modify, waive, or ignore applicable state law that conflicts with its actions or representations. *See Technology Investors,* 689 A.2d at 1062; *cf. Rhode Island Alliance,* 747 A.2d at 469 ("statutory obligations cannot be bargained away via contrary provisions in a [collective bargaining agreement], nor can they be compromised by the past or present practices of the parties"). As we have stated repeatedly, such an estoppel cannot be applicable when the acts in question are "clearly ultra vires." *Technology Investors,* 689 A.2d at 1062. Thus, "[t]his Court has squarely rejected the proposition that a municipality may be bound by the actions of an agent without actual authority." *Providence Teachers II,* 689 A.2d at 391.[4]

Indeed, just last term, in *Rhode Island Alliance,* we stated that "the renegade legal interpretations of a high-ranking state official can[not] override a state law that plainly provides otherwise." 747 A.2d at 470. As a result, we concluded, "if a statute contains or provides for nondelegable and/or nonmodifiable duties, rights, and/or obligations, then neither contractual provisions nor purported past practices nor arbitration awards that would alter those mandates are enforceable." *Id.* at 469. We can fathom no reason for us to depart from this rationale in this case. Although we are not dealing here with a public union or its members but rather with a former state engineer who is now a management-level municipal-government employee, the same principle should be controlling. What is sauce for the union goose should be sauce for the managerial gander.

In this case, the executive director and the retirement counselor who spoke with Romano before he retired possessed no more authority to waive the municipal-employment limits on Romano's receipt of state retirement benefits (as set forth in § 36–10–36) than the school board possessed in *Providence Teachers II* to enter into a collective bargaining agreement with the teacher's union without the ratification of the city council. *See Providence Teachers II,* 689 A.2d at 391. Therefore, to the extent they may have advised Romano that he could work for a municipality on a full-time basis without suffering any diminishment of his state pension, the agents of the retirement board, like the school board itself in the *Providence Teachers* cases, were acting ultra vires and lacked any authority to bind the state to provide retirement benefits to Romano beyond those allowed by state law. *See Providence Teachers II,* 689 A.2d at 391; *Providence Teachers I,* 689 A.2d at 386. Indeed, perhaps in recognition of her limited authority, the retirement counselor told Romano that if he had any questions whatsoever about post-retirement reemployment, he should "go to the retirement board to stay out of trouble." *See* G.L.1956 § 42–35–8 (empowering agencies like the board to issue advisory opinions "as to the applicability of any statutory provision or of any rule or order of the agency"). Thus, contrary to the dissent's conclusion, Romano had every reason to believe that the retirement counselor was not speaking for the board when she supposedly told him he could work for the town without affecting his state pension; otherwise, why would she then tell him in the same breath that he should "go to the retirement board to stay out of trouble"? The dissent's further suggestion that "it is far more likely that she meant that he should consult with the [board's] staff" is most unpersuasive; after all, the retirement counselor herself *was* part of the board's staff. So why, we submit, would a board staffer tell Romano that he should go to the board itself to

---

**4.** In *Providence Teachers Union v. Providence School Board,* 689 A.2d 388 (R.I.1997), we held that a collective bargaining agreement entered into by a school board and a teachers' union was invalid and that the union could not reasonably rely on it because, pursuant to both statute and ordinance, ratification by the city council was required before any such agreement could be binding on the city. *Id.* at 391; *see also Providence Teachers Union v. Providence School Board,* 689 A.2d 384, 385–86 (R.I.1996).

stay out of trouble—yet really mean that he should just consult with other board staff? Further, given § 42–35–8, we conclude that Romano possessed standing to request the board to provide him with an advisory opinion concerning whether ·he could accept a salary based upon his working at full-time municipal employment after retiring from state service, yet still receive his full state-pension benefits while doing so. Nonetheless, we have no indication that Romano ever submitted such a request or otherwise went to the board as the retirement counselor advised him to do.[5]

In *Ferrelli*, this Court quoted with approval from the Maryland Supreme Court's decision in the case of *City of Baltimore v. Chesapeake Marine Railway Co.*, 233 Md. 559, 197 A.2d 821, 831–32 (1964), citing it for the following proposition: "*Estoppel* against a municipal corporation growing out of affirmative action *must be predicated upon the acts or conduct of its officers, agents or official bodies acting within the scope of their authority.* 10 McQuillan, Mun. Corp. (3rd Ed.), Sec. 28.56 * * *." (Emphasis added.) 106 R.I. at 592–93, 261 A.2d at 909.[6]

**5.** We do not equate Romano's contacts with the board's executive director, Mr. Hickey, as the legal equivalent of Romano going to the board itself. And we are not suggesting, as the dissent contends, that Romano "should have sought a meeting with the entire board." Rather, his equitable posture in this case might have been enhanced if he had heeded the retirement counselor's advice and sought a ruling from the board itself after making some sort of a written submission requesting such relief, instead of merely relying upon the retirement counselor's off-the-cuff verbal opinion, one that also suggested he should go to the board "to stay out of trouble." In any event, the board itself would have been powerless to modify the clear provisions of controlling state law. So the only bearing this discussion has for the outcome of this case is on Romano's culpability for receiving the illegal payments in the first place, and on the fairness of requiring him to disgorge all or part of his ill-gotten gains. Moreover, Hickey's statements to a town official on which Romano also based his estoppel defense did not contravene state law because they were literally true: state law did not bar Romano from accepting municipal employment while he was also receiving pension payments from the state, nor did it penalize Romano merely for working for the town while he was also receiving a state pension. Rather, § 36–10–36 permitted Romano to accept municipal employment but it also limited him to working seventy-five full days of employment (or 150 half days) without resulting in a suspension or forfeiture of his state pension benefits. Thus, nothing Hickey said or did should have estopped the board from enforcing applicable and controlling state law against Romano.

**6.** Although in *Ferrelli v. Department of Employment Security*, 106 R.I. 588, 261 A.2d 906 (1970), the Court chose to remand the case to the Board of Review of the Department of Employment Security for a determination of whether the alleged agreement between a representative of that agency and the claimant's union in fact existed as claimed, and, if so, whether the board's agent was authorized to enter into any such agreement, the Court may have done so to avoid deciding the estoppel question until and unless the underlying facts on which the asserted estoppel was premised could be established. Moreover, the authority of the governmental agent to enter into the alleged agreement with the union may not have been ascertainable simply by reviewing the terms of G.L.1956 § 28–42–4, the statute that required the employment services in question to have been "localized in Rhode Island or, in the alternate not localized in any state but some of it performed in Rhode Island." *Id.* at 591, 261 A.2d at 909. Some supervening federal law, another state statute, or a valid regulation may have authorized the agency or its representative to waive this requirement or to modify it in the context of an agreement to do so with the employee's union. But the critical point is that the *Ferrelli* Court was not prepared to pass on this question without the requisite fact finding and legal determinations having been made in the first instance by the lower tribunals—an option that, as an appellate court of last resort, this Court has pursued in other cases too frequent to mention, including this one. *Id.* In any event, the *Ferrelli* Court quite clearly set forth its view that estoppel against the government "*must* be predicated upon the acts or conduct of its officers, agents or official bodies *acting within the scope of their authority.*" *Id.* at 592–93, 261 A.2d at 909. (Emphases added.) Therefore, we disagree with the dissent that our decision in this case is inconsistent with Ferrelli. Indeed, *Ferrelli's* teaching on this very point is that the board in ·this case should not be estopped

Moreover, we do not abrogate the doctrine of equitable estoppel by following the *Ferrelli* rule that government officials must be duly authorized—acting within their authority and consistently with state statutes—before governmental entities can be subject to equitable estoppel based upon their representations or conduct. There have been and will continue to be many situations, such as those in *Schiavulli v. School Committee of North Providence*, 114 R.I. 443, 444–51, 334 A.2d 416, 417–20 (1975), and *Greenwich Bay Yacht Basin Associates v. Brown*, 537 A.2d 988, 989–93 (R.I.1988), in which the doctrine of estoppel can be applied against governmental entities without doing violence to any state statutory mandate or to the requirement that officials be duly authorized before their agencies will be estopped. In *Schiavulli*, a school committee was estopped to deny a tenured teacher's request for an unpaid leave of absence when the committee was found to have a duty to vote on the teacher's unpaid leave request instead of failing to act on it at all. *Schiavulli*, 114 R.I. at 449–51, 334 A.2d at 419–20. But there was no suggestion that granting the teacher's leave request would have been *ultra vires* or contrary to any state statute or other law prohibiting such leave. *See id.* On the contrary, it was

plain that the school committee had this authority and, therefore, its inaction in the face of a duty to respond could be and properly was found to constitute an estoppel. *See id.* Likewise, in the *Greenwich Bay* case, the state agency in question was not acting *ultra vires* or contrary to state law when it represented to the applicant that it would evaluate its request for approval under the regulatory program that existed when the request was submitted. *Greenwich Bay*, 537 A.2d at 989–91. Thus, we overrule neither *Schiavulli* nor *Greenwich Bay* by adhering to the requirement espoused in *Ferrelli* and followed in *Technology Investors* that "[e]stoppel against a [public entity] * * * must be predicated upon the acts or conduct of its officers, agents or official bodies acting within the scope of their authority ." *Ferrelli*, 106 R.I. at 592–93, 261 A.2d at 909; *see also Technology Investors*, 689 A.2d at 1062; *Greenwich Bay*, 537 A.2d at 991–93; *Loiselle v. City of East Providence*, 116 R.I. 585, 591, 359 A.2d 345, 349 (1976) (holding that municipality was not estopped to enforce a residency requirement against a municipal official whose conduct in the matter at issue was also blameworthy); *Schiavulli*, 114 R.I. at 449, 334 A.2d at 419.[7]

from suspending payments to Romano based upon the statements of its former agents or representatives. *See id.* Such officials would not have been acting within the scope of their authority to the extent that they suggested to Romano that he could work full-time for a municipality without any adverse impact upon his state pension.

7. *Loiselle v. City of East Providence*, 116 R.I. 585, 592–93, 359 A.2d 345, 349 (1976), held that the doctrine of equitable estoppel could *not* be invoked against the governmental entity in that case based upon the government's alleged failure to enforce a municipal residency requirement against the plaintiff, a municipal treasurer. The ordinance required all municipal appointees and employees to become city residents within six months after they commenced employment with the city. Despite having had notice some months previous that the city was seeking to apply this requirement to him, the officer in question—a municipal treasurer—was held not entitled to

invoke the doctrine of equitable estoppel against the municipality when he had made no effort to resolve his residency problem until three days before he was scheduled to be fired and when he had failed to include any of his alleged missed employment opportunities in the agreed statement of facts that he had filed with the court. Thus, *Loiselle* stands for the proposition that a governmental entity will *not* be estopped by its own alleged failure to enforce an applicable legal requirement against a person dealing with that entity when the person invoking the estoppel doctrine is also at fault because of his or her own blameworthy conduct in the matter at issue. In this case, Romano's conduct in failing to file the requisite monthly municipal-employment reports with the board and in failing to heed the advice he received from the board's retirement counselor to "go to the retirement board to stay out of trouble" concerning any post-retirement reemployment questions he may have entertained were at least as blameworthy as the employee's conduct was in *Loiselle*. *Loiselle*, 116 R.I. at 591, 359 A.2d at 349.

We also have long held that a person's failure to discover the true scope of a government agent's actual authority will not provide any grounds to relieve that person's detrimental reliance upon the agent's representations or actions. *See Providence Teachers II*, 689 A.2d at 392 (citing *Vieira v. Jamestown Bridge Commission*, 91 R.I. 350, 358, 163 A.2d 18, 23 (1960); *Murphy v. Duffy*, 46 R.I. 210, 215–16, 124 A. 103, 105 (1924)). Indeed, to rule otherwise would undermine the integrity and structure of our state government because it would allow every government official to act as his own mini-legislature, cashiering those laws he or she dislikes, is ignorant of, or misinterprets, and instead molding the law to be whatever the government official claims it to be.

Thus, even in cases in which a government agent is acting with limited actual authority, as in *Warwick Teachers' Union*, we have held that persons dealing with that agent may not reasonably rely upon actions which exceed that agent's actual but limited authority. *See Warwick Teachers' Union*, 624 A.2d at 851. In *Warwick Teachers' Union*, a school committee appointed negotiators to enter into a new collective bargaining agreement with the teachers' union. *Id.* at 850. The negotiators agreed to certain terms that exceeded their authority, but we held that the agreement was not binding because the negotiators lacked actual authority to bind the municipality to these terms. *Id.* at 851. Accordingly, even if the executive director and retirement counselor in this case had possessed some actual authority to give advice on behalf of the retirement board, they had no authority whatsoever to exempt Romano from a clear statutory mandate, one that prohibited a retired state employee from receiving full state pension benefits while simultaneously working full-time for a municipality and collecting a full municipal salary. Any such representations would have exceeded any actual or apparent authority they may have possessed. Hence, as in *Warwick Teachers' Union*, Romano was not entitled

to rely upon those representations to support a defense of equitable estoppel because "the authority of a public agent to bind * * * must be actual." *Id.* at 851 (citing *School Committee of Providence*, 429 A.2d at 1302).

In sum, following the teaching of *Casa DiMario, El Marocco Club, Technology Investors, Ferrelli, Loiselle, Schiavulli*, and the other cases cited in this opinion, we rule in this case that the doctrine of equitable estoppel did not preclude the state's retirement system from suspending the pension overpayments received by Romano while he was also working full-time for the municipality in violation of applicable state law. *See Casa DiMario, Inc.*, 763 A.2d at 612–13; *El Marocco Club*, 746 A.2d at 1233–34; *Technology Investors*, 689 A.2d at 1062; *Loiselle*, 116 R.I. at 592–93, 359 A.2d at 349; *Schiavulli*, 114 R.I. at 449, 334 A.2d at 419; *Ferrelli*, 106 R.I. at 592, 261 A.2d at 909. Thus, in contrast to the dissent, we conclude that this is not an appropriate occasion to temper our long-followed "actual-authority" rule in cases involving the actions of government agents by applying an equitable, case-by-case evaluation of the circumstances. Such a relaxation of the rule would open the door—unnecessarily, we believe—to ad hoc and unpredictable adjudications in these types of cases.

## II

### The Propriety of Restitution

With respect to whether the trial justice was correct in ordering Romano to reimburse the state for those pension benefits he received that should not have been paid to him because of his full-time municipal employment, we remand this case to the Superior Court for a new trial on this issue. The trial justice ordered Romano to reimburse the state *sua sponte*—even though the board never asked for this relief and even though Romano never had the chance to demonstrate why such a remedy would be inequitable. Thus, the

parties never had the chance to introduce evidence concerning whether such relief would be appropriate in this case. Moreover, the trial justice did not distinguish between the retirement benefits paid to Romano from the date of his retirement in 1989 through 1996, when the board notified him of its decision to suspend his benefits in accordance with state law, and those paid thereafter from 1997 to 1999, when Romano continued to receive such benefits after seeking and obtaining a temporary injunction preventing the board from suspending his benefits.

■ In this case, from 1989 to 1996 the state mistakenly paid retirement benefits to Romano, money that he was ineligible to receive under state law because of his full-time municipal employment. Thereafter, until 1999, it continued to pay retirement benefits to Romano pursuant to a court order requiring it to do so. But the board did not discover Romano's full-time municipal-employment status until 1996. Even if the board was at fault for failing to discover this information sooner, a party who has conferred a benefit upon another by mistake is not precluded from maintaining an action for restitution because the mistake was caused by that party's own lack of care. *See Toupin v. Laverdiere,* 729 A.2d 1286, 1289 (R.I.1999) (holding that a party has "a cognizable action to seek the return of his money even though the overpayment might have been the product of his own negligence"); *see also Woonsocket Teachers Guild Local Union*

*951 v. Woonsocket School Committee,* 694 A.2d 727, 729 (R.I.1997).[8]

Although § 36–10–36 allowed Romano and other retired state employees to accept work from municipalities while continuing to receive their full state pension benefits, it also required in return that they work no more than seventy-five days in a calendar year (or 150 half days) and that they send monthly notices to the retirement board of any municipal employment they obtained. Romano worked for the town for more than seventy-five days in every calendar year after he retired from the state in 1989, but the record contains no indication that he ever filed any notices of his full-time municipal employment with the board as § 36–10–36(b) required him to do. Presumably, the General Assembly included the monthly notice requirement in the law so that the board could track the municipal employment of working retirees like Romano and ensure that they did not evade the law as Romano did for many years. Having failed to comply with the statute's burden, Romano, like the teacher in *Woonsocket Teacher's Guild,* might well be found after a retrial to have forfeited his right to retain all or certain portions of the pension overpayments—benefits he should not have been able to obtain in the first place had he (1) heeded the retirement counselor's injunction to "go to the retirement board to stay out of trouble" concerning any post-retirement reemployment questions and (2) filed the requisite monthly notices with the board of his continuing municipal employ-

8. There, we ordered a disabled teacher to pay back over four years worth of retirement benefits (plus interest at twelve percent) that she had received following a disabling, work-related assault because she had failed to apply to the state's retirement system for such benefits—as state law required—after she was absent from work for over a year. Although the *Woonsocket Teachers' Guild* case did not involve any alleged misrepresentations by government agents about what the teacher needed to do to obtain retirement benefits, here, like the statute we construed in that case, "[t]he bitter is inseparable from the sweet." *Woonsocket Teachers' Guild Local Union 951*

*v. Woonsocket School Committee,* 694 A.2d 727, 729 (R.I.1997). To avoid suspension of his state pension benefits, Romano was required to observe the workday limits on his post-retirement municipal employment and to file monthly employment reports while receiving his state pension benefits, yet he failed to do so. Thus, depending principally on what use Romano made of the pension overpayments he received and the extent to which he changed his individual circumstances in reliance upon his receipt of such excess benefits, it may or may not be inequitable to require him to reimburse the state for payments he was never entitled to receive in the first place.

ment beyond the statutory seventy-five-day cap. *See Woonsocket Teachers' Guild,* 694 A.2d at 729. On the other hand, Romano may have so changed his circumstances in reliance upon his receipt of the excessive pension payments that requiring him to reimburse the state in whole or in part for this money would be unjust and inequitable. But this calculus depends on the results of a factual and equitable inquiry before the trial court that has yet to occur in this case.

This Court addressed a similar situation some years ago in the case of *Jonklaas v. Silverman,* 117 R.I. 691, 370 A.2d 1277 (1977). *Jonklaas* involved a stockbroker's suit against a customer to recover a mistaken overpayment of stock-sale proceeds. *Id.* at 692, 370 A.2d at 1279. The stockbroker brought suit against the customer some five years after the mistaken overpayment. *Id.* This Court, in a three-to-two decision, reversed the trial justice's restitution order and remanded the case for a new trial because "the trial justice overlooked the law which provides that where there is a change of circumstances that could make restitution unjust and inequitable the loss must be borne by the party making the mistake." *Id.* at 698–99, 370 A.2d at 1282. Because the trial justice excluded evidence tending to show that the recipient of the mistaken overpayment had experienced a change in circumstances that would have made restitution unjust and inequitable, the *Jonklaas* court ordered a new trial. *Id.* at 699, 370 A.2d at 1282. Justices Joslin and Kelleher, however, dissented—even though they agreed with the majority that money paid under a mistake of fact may not be recovered if the recipient has so changed his or her position by reason of the overpayment as to make it inequitable to require restitution. *Id.* The dissenting justices were of the opinion that "what constitutes a requisite change of circumstances under that rule is often a very close question, and the answer will turn on the facts of the particular case." (Joslin, J., dissenting). *Id.* Because the recipient of the mistaken over-

payment had failed to make an offer of proof concerning why he was not unjustly enriched and showing that the alleged change in his circumstances had rendered inequitable the stockbroker's claim for restitution, they believed that the trial justice's ruling ordering reimbursement of the overpayment should have been upheld. *Id.* at 700–01, 370 A.2d at 1282–83.

Significantly for our purposes, Justices Joslin and Kelleher noted that "not every change of circumstances is available as a defense" to a restitution claim. *Id.* at 699, 370 A.2d at 1279.

> "[T]he recipient will not be required to make restitution if by reason of the mistaken payment he has assumed liabilities and obligations that he would not otherwise have assumed, * * * or if he has turned over the money to a third party to whom he was under a legal or contractual obligation to pay all or part of the funds so received. * * * It follows that evidence to establish those facts is admissible. On the other hand, restitution will be required if the recipient has used the money to cover living expenses or to pay preexisting debts. * * * Consequently, the recipient is not entitled to introduce evidence to establish such use of the erroneous payment." *Id.* at 699–700, 370 A.2d at 1282.

Moreover, in this case, unlike *Jonklaas,* we are dealing with excessive pension payments involving public funds. Hence, all the more reason why we should be very careful before concluding that the government is not entitled to recover any of the overpayments. Indeed, the case law that restricts the availability of the equitable-estoppel doctrine for use against governmental entities ensures that "public funds will be spent according to the letter of the difficult judgments reached by [the elected legislature] as to the common good and not according to the individual favor of [unelected and unauthorized] government agents or the individual pleas of litigants." *Office of Personnel Management v. Rich-*

*mond,* 496 U.S. 414, 428, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387, 395 (1990).

In any event, the present record is simply inadequate to determine whether restitution is appropriate. The reason for this is because the trial justice ordered the remedy of restitution *sua sponte*—even though the board never asked for this relief and even though the evidence was insufficient to determine, as a matter of law, whether the board was entitled to restitution. For example, we have no idea what Romano did with the pension overpayments, yet he bore the burden "to prove that it will be inequitable to require restitution." *Jonklaas,* 117 R.I. at 698, 370 A.2d at 1281. And because the board had not asked either Romano or the court for this relief, Romano had no notice that restitution was at issue—at least before the board notified Romano in 1996 of its intention to suspend his benefits. Thus, the trial justice ordered restitution out of the blue without giving the parties any notice that this relief was in the offing.[9] Thus, the record is barren of the facts and circumstances that should have informed the trial justice's decision on this point under the *Jonklaas* case. *See id.* at 699–700, 370 A.2d at 1282.

To rule on this issue with an appropriate factual predicate, the parties should have been directed to introduce and the trial justice should have obtained evidence on at least the following issues, among others, that may be pertinent to the equities of this situation: what has Romano done with the pension overpayments? Has he assumed liabilities and obligations that he would not have otherwise assumed? Has he turned over the money to a third party to whom he was under a legal or contractual obligation to pay all or part of the funds received? If so, it may be inequitable to require him to make restitution. *Id.* Or, conversely, has he merely stockpiled the funds in a savings account or used the money to cover his living expenses or to pay his preexisting debts? If so, then restitution may not be inequitable, especially during the period from 1997 to 1999 when the Superior Court had enjoined the board from suspending his benefits during the pendency of Romano's administrative appeal. *Id.*[10]

### Conclusion

For these reasons, we grant, in part, the petition for certiorari, we quash the order of restitution, and remand this case for a new trial to determine whether restitution is an appropriate remedy in this case and, if so, to what extent restitution would be equitable under the circumstances. Thus, far from directing a Superior Court justice to require Romano to repay all or a significant portion of the illegal benefits that he

---

**9.** Although Rule 54(c) of the Superior Court Rules of Civil Procedure provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled even if the party has not demanded such relief in the party's pleadings," whether the board was entitled to restitution in this case was primarily a factual question that could not be determined on the basis of the record before the trial justice.

**10.** Therefore, we do not, as the dissent suggests, "implicitly direct[ ] a justice of the Superior Court to require Romano to repay all or a significant portion of the benefits that he received." On the contrary, we expressly leave it to the Superior Court on remand to determine whether any such restitution should occur and, if so, in what amount. Such a determination should be based upon an appropriate factual predicate and upon the application of the equitable principles discussed in this opinion and in *Jonklaas v. Silverman,* 117 R.I. 691, 370 A.2d 1277 (1977). We are simply in no factual position at this time to determine whether there is any basis for the dissent's concern about "the possible catastrophic effect of [Romano] being required to repay the state thousands of dollars in benefits," much less to decide whether restitution would "force Romano into potential insolvency." And we hardly think it is "unconscionable," as the dissent suggests it is, to ask the Superior Court on remand to make these determinations based upon a factual record, rather than having this Court simply act upon the unsubstantiated fears and phantasmagoria that the dissent has conjured up without knowing whether these concerns have any basis in reality.

received, as the dissent perceives us to be doing, we are simply requiring the court on remand to examine the facts and circumstances surrounding what Romano did with the illegal pension money he received and to determine whether it would be inequitable to require him to reimburse the state, in whole or in part, for any of that money. But in so doing, we also deny the remaining portion of the petition for certiorari and affirm the trial justice's ruling that the doctrine of equitable estoppel did not preclude the board from suspending Romano's future pension payments for so long as he remained a full-time municipal employee.

Justice FLANDERS did not attend the oral argument but participated on the basis of the briefs.

WEISBERGER, Chief Justice, with whom Justice GOLDBERG joins concurring and dissenting.

I concur with the majority in the portion of the opinion that affirms the trial justice's holding that the retirement board properly terminated Mr. Romano's future benefits so long as he fails to meet the conditions set forth by G.L.1956 § 36–10–36. Even though I believe that Romano had been grievously misled by the retirement counselor and by the then-executive director, Donald Hickey, concerning his ability to receive retirement benefits while he was working full time as a municipal employee, I recognize that our case law as well as that of the United States Supreme Court precludes the application of equitable estoppel into the future.

However, I strongly disagree with the majority's remand of this case that implicitly directs a justice of the Superior Court to require Romano to repay all or a significant portion of the benefits that he received. In my judgment, this is an unnecessarily harsh result that exhalts rigidity over equitable considerations.

First of all, I do not believe that Romano committed any act that could be termed as *malum in se*. He committed no evil.

The term "double-dipping" implies that an individual sought and obtained benefits to which he was not normally entitled. In the case at bar, Romano fulfilled all the conditions that entitled him to his retirement as an engineer for the Department of Transportation (DOT). He had served faithfully for twenty-five years. When the governor announced an early retirement incentive package in 1989, Romano took steps to determine whether retiring pursuant to that package would preclude his working as a municipal employee for the Town of Bristol (town). Almost at the same time as the governor's announcement of the early retirement incentive, Romano was approached by the then-Administrator of the town, Halsey Herreshoff (Herreshoff), who offered him a position as director of public works for the town. After receiving this offer, Romano consulted a retirement counselor employed by the retirement board (board), Elaine Drapeau (Drapeau), to discuss his potential retirement from DOT. At that meeting, Romano informed Drapeau that he had been offered a position with the town, and asked whether accepting that position would affect his ability to collect his pension. Drapeau informed Romano that employment with the town was permissible and that his pension benefits would not be adversely affected. The majority opinion suggests that Drapeau advised him that if he wanted to stay out of trouble, he should "go to the retirement board." I do not accept the inference drawn by the majority from this statement. When Drapeau advised that "when you have any questions whatsoever about post-retirement reemployment, go to the retirement board to stay out of trouble," it is far more likely that she meant that he should consult with the staff. Romano had no standing to invoke a meeting of the board and had every reason to believe that Drapeau spoke for the board.

Nevertheless, Romano and Herreshoff took an additional step to assure that his work for the town would not interfere with

his state retirement benefits. Herreshoff contacted the then executive director of the board, Donald Hickey (Hickey), to clarify what Romano had been told. Hickey responded by mail that "[s]ince the municipal system is a different system and only administered by us, there is no prohibition against a state retiree working for and belonging to a municipal system." Herreshoff showed that letter to Romano, who interpreted it to mean that he could simultaneously collect his retirement pension and receive a salary from the town. Acting on this advice, he retired from his state job and almost immediately thereafter began working for the town. He also began contributing to the state municipal employees' retirement system, which is administered by the state as part of the overall state retirement system.

For nearly seven years thereafter, Romano collected his state pension while he simultaneously worked for the town. In so doing, he committed no evil act. He worked for the salary that he collected. He was unaware of the provisions of § 36–10–36(b), which provides in pertinent part.

"Any member who has retired under the provisions of titles 16, 36, or 45 may be employed or reemployed by any municipality within the state for a period of not more than seventy-five (75) working days or one hundred fifty (150) half days with half day pay in any one calendar year without any forfeiture of or reduction of any retirement benefits and allowances the member is receiving or may receive as a retired member. *Pension payments shall be suspended whenever this period is exceeded.*" (Emphasis added.)

It was not until January 1996 that he received a letter signed by the new executive director, Joann Flaminio, informing him that his employment with the town rendered him ineligible to receive his pension.

I agree that, generally, equitable estoppel will not be applied against a government agency acting in a public capacity. However, "this [C]ourt has applied the doctrine of equitable estoppel against administrative and municipal authorities under circumstances where justice would so require." *Greenwich Bay Yacht Basin Associates v. Brown,* 537 A.2d 988, 991 (R.I.1988). We said in that case that the doctrine "will not be applied unless the equities clearly [balance] in favor of the parties seeking relief under [the] doctrine." *Id.* It is true that in *Greenwich Bay Yacht Basin Associates,* the officials were acting within their authority. *See id.* at 989–90. I recognize that in *Office of Personnel Management v. Richmond,* 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), a majority of the Supreme Court declined to apply equitable estoppel in favor of a retired Navy employee who was deprived of disability annuity payments for a period of six months because his earnings exceeded the statutory limit. He had earned these amounts based upon erroneous assurances given to him by an employee relations specialist at the Navy Public Works Center's Civilian Personnel Department. *See id.* at 417–18, 110 S.Ct. at 2468, 110 L.Ed.2d at 394–95. The specialist had even given the disabled employee a copy of a government manual published by the OPM that was out-of-date and therefore inaccurate. *See id.* Justice Kennedy wrote that decision, which held that the Appropriations Clause precluded any payment that did not comport with the statutory condition. *See id.* at 423–24, 110 S.Ct. at 2471, 110 L.Ed.2d at 398. However, I respectfully disagree with that holding, just as I disagree with the opinion of the majority in respect to restitution in this case. Justice Stevens concurred in the judgment but observed that the Appropriations Clause should not have been a bar and was indeed irrelevant to the case. *See id.* at 435, 110 S.Ct. at 2477, 110 L.Ed.2d at 406. Justices Marshall and Brennan, in dissent, suggested that the Court need not read the statute as inflexibly as it did. *See id.* at 438, 110 S.Ct. at 2479, 110 L.Ed.2d. at 408. They suggested that the appropri-

ation was made to pay disability annuities to a class, but relied upon the executive to implement the law fairly in individual cases. *See id.*

The majority contends that everyone is presumed to know the law and that no public official may, by interpretation, enlarge the liability of a government agency to pay benefits beyond those statutorily established. I agree that this argument has great force. Nevertheless, in this era of proliferation of administrative agencies, many of which are clothed with rulemaking as well as interpretative authority as is the board in the case at bar, such a presumption must be tempered by an equitable case-by-case evaluation of the circumstances. For example, an examination of the Internal Revenue Code of the United States, together with the regulations promulgated in interpretation thereof, would make such a conclusive presumption of knowledge of the law by all citizens to be as anachronistic as the immutable and unbending ancient laws of the Medes and the Persians.

In the case at bar, if Romano had been given the correct information, he might well not have retired from his position with DOT. Consequently, it is reasonable to infer that he was misled to his detriment. The retirement benefits were not equal to his salary. In all probability, the additional income from the town made his retirement viable. He had no reason to disregard the advice of the executive director of the agency, particularly since it was identical to that given to him by a retirement counselor. The suggestion that he should have sought a meeting with the entire board borders upon the ludicrous. As was pointed out in dicta in *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42, 52 (1984), the Court was "hesitant * * * to say that there are *no cases* in which the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some

minimum standard of decency, honor, and reliability in their dealings with their Government."

Our own Court in *Ferrelli v. Department of Employment Security,* 106 R.I. 588, 261 A.2d 906 (1970), remanded a case to the Superior Court to determine factually whether a person who had collected unemployment compensation for out of state employment had been justified in so doing because of an agreement between a business agent of the union of which Ferrelli had been a member and a representative of the Department of Employment Security (agency). According to the claimant, the agreement related to the payment of contributions to the Rhode Island fund by out-of-state employers and was implemented by the action of the representative of the agency (Mr. Clarke) in providing the union with forms that its members were to give to out-of-state employers to enable them to make such contributions to the fund. *See id.* at 592, 261 A.2d at 909. The claimant argued that, pursuant to this agreement, he provided his out-of-state employers with the forms and that contributions were made to the agency. *See id.* He further argued that in the past, he had been held to be eligible for unemployment compensation benefits on the basis of contributions that had been made to the fund by his out-of-state employers. *See id.*

On the basis of this claim, the Supreme Court of Rhode Island, in an opinion written by Chief Justice Roberts, remanded the case to the Superior Court for a further remand to the board of review to make a finding "as to whether representations allegedly made by Mr. Clarke, in accordance with the extensive testimony of Mr. Kiley on that question, were in fact made." *Ferrelli,* 106 R.I. at 594, 261 A.2d at 910. It is also true that upon remand the board was to consider whether these representations by Mr. Clarke were within the scope of his authority as such an employee. *See id.* at 595, 261 A.2d at 910.

Under the uncompromising view taken by the majority, no such remand would

have been necessary because if a review of the statute indicated that Mr. Clarke did not act in accordance therewith, he would have had no authority to act inconsistently with its terms. Consequently, either *Ferrelli* contains statements by the Court that could never have been of any conclusive effect, or the Court, in accordance with its extensive elucidation of the doctrine of equitable estoppel, was of the opinion that statements by Mr. Clarke, if he was clothed with apparent authority, might well have been binding upon the Department of Employment Security. In that case, either the Supreme Court of Rhode Island was willing to test the doctrine of apparent authority, or it wrote a decision that was completely meaningless. I would not attribute any such lack of comprehension to our predecessors on this Court.

All the cases cited by the majority either relate to future application of ill-advised determinations by state officers or to situations in which no misleading information had been given by those who were in positions of authority.

I do not believe that the minimum standard of decency, honor, and reliability which *Heckler* suggests that persons should expect in dealings with their government is consistent with the outcome of this case. To visit upon an unoffending state employee the possible catastrophic effect of being required to repay the state thousands of dollars in benefits to which he believed that he was entitled and which were paid for many years without objection by the retirement system is unnecessarily harsh. To send this back to the Superior Court to determine what he had done with this money, including using it to cover his living expenses or to pay his preexisting debt, is unconscionable. Under the directions of the majority, a Superior Court justice would be virtually constrained to order a significant amount of restitution regardless of its effect upon Romano. If this is a standard of decency and honor, then my definition of such a standard differs so greatly from that of the majority that I find it impossible to comprehend that such a standard has been implemented under the facts of this case.

I would end this unseemly controversy by terminating Romano's retirement benefits in the future so long as he exceeds the conditions set forth by the statute, but would reverse the trial justice's judgment insofar as it requires repayment of benefits received up to the date of the trial justice's decision. I would not add insult to injury by remanding this case to a justice of the Superior Court with virtual directions to force Romano into potential insolvency for having committed no evil act save that of relying upon the advice of persons whom he had every reason to believe were in a position to enunciate the policy of the board.