**RETIRED ADJUNCT PROFESSORS of the STATE of RHODE ISLAND**

v.

**Lincoln C. ALMOND,[1] Governor of the State of Rhode Island et al.**

**No. 95–720–Appeal.**

Supreme Court of Rhode Island.

March 13, 1997.

---

1. The plaintiffs originally named Governor Bruce Sundlun, in his capacity as chief executive of the State, as a defendant. Under Super.R.Civ.P. 25(d)(1), when a public officer ceases to hold office, his or her successor is automatically substituted as a party. Accordingly, we have substituted the incumbent Governor, Lincoln C. Almond, as a party-defendant and have amended our case caption to reflect this change.

Paul J. Pisano, for Plaintiff.

Michael P. DeFanti, Laura A. Pisaturo, Thomas A. Palombo, Asst. Atty. General, Harris Weiner, Governor's Office, Providence, for Defendant.

## OPINION

FLANDERS, Justice.

This appeal requires us to determine whether it is constitutionally permissible for the General Assembly to enact a law that changes how much part-time state work retired professors (formerly employed by public universities or colleges) can engage in before their pensions will be suspended.

The plaintiffs are educators who allege that they retired from jobs with public colleges or universities when State law allowed them to be reemployed by the State of Rhode Island (the State) for up to 75 full days or 150 half days before their pension payments would be suspended. *See, e.g.,* G.L.1956 § 36-10-36, as amended by P.L. 1988, ch. 514, § 1. The defendants are the Governor of Rhode Island, in his capacity as chief executive of the State; the General Treasurer, in her capacity as chair of the Retirement Board of the Rhode Island Employees' Retirement System; and the executive director of the Retirement Board.

In 1994 the General Assembly changed the applicable law to preclude state reemployment entirely for these professorial pensioners "unless any and all retirement benefits to which [they] may be entitled * * * are suspended for the duration of any such employment or reemployment." Public Laws 1994, ch. 142, § 1. The plaintiffs filed suit challenging this law, and in 1995 the General Assembly again amended the statute, retroactive to July 7, 1994. *See* P.L.1995, ch. 245, § 1. Under the 1995 amendment the retired professors can still accept offers of reemployment from the State, but now their gross part-time salary for such work cannot exceed $10,000 in any one calendar year without triggering a suspension of their pensions.

■ A Superior Court justice permanently enjoined the application of this change in the law to plaintiffs. Specifically, he found that their statutory reemployment opportunities as they existed when they retired were contractual rights that could not be altered by the Legislature and applied to them retroactively without offending the contract clauses in both the State and the Federal

Constitutions.[2] We review the issuance of a permanent injunction to see if the Superior Court justice overlooked any material evidence or was otherwise clearly wrong in granting such extraordinary relief. *E.g., Reback v. Rhode Island Board of Regents for Elementary and Secondary Education*, 560 A.2d 357, 359 (R.I.1989). For the reasons delineated below, we believe the trial justice erred in permanently enjoining defendants from applying this new pension law to plaintiffs. Because the State has never been obliged to offer post-retirement reemployment to plaintiffs and because plaintiffs have never been required to accept such reemployment, plaintiffs had no contractual or other protected property right in being reemployed by the State after their retirement. Moreover, the statutes in question contain no language granting or even referring to any contractual or other right of these public pensioners to obtain post-retirement reemployment from the State. And none can be presumed or inferred from the way the statutes are worded. Therefore, we believe that plaintiffs are not entitled to complain when the State decides to change the terms on which it may opt to offer such reemployment opportunities to retired professors like these plaintiffs.

■ Even though, in deciding to retire, plaintiffs may have relied on the potential availability of future reemployment offers from the State pursuant to the then-existing terms of § 36–10–36, they were not entitled to conclude that these provisions were fossilized in legislative amber. *See Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (retroactive legislation is constitutional if the legislation effects a legitimate purpose furthered by a rational means). On the con-

trary, lacking any guarantee of reemployment or of any right to be offered reemployment, they should have known that the State would be free to fiddle with the terms on which it might decide to offer such reemployment opportunities to them at any time. *Id.* at 729, 104 S.Ct. at 2718, 81 L.Ed.2d at 611 (" 'legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations' "). Indeed, unless a statute or a contract provides otherwise, post-retirement reemployment with the State is always optional with both parties: the State is not obliged to offer it, and the retirees are not obliged to accept it if it is offered. But if they do accept, they must accept it on terms that the State is then willing to include as part of its offer.

■ The mere fact that a state enacts laws that benefit the interests of some people does not automatically create contract rights to those benefits. *See National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co.*, 470 U.S. 451, 465–66, 105 S.Ct. 1441, 1451, 84 L.Ed.2d 432, 446 (1985). Rather, a statute will be treated as creating a binding contract with its beneficiaries only when the language and the circumstances of the statute's enactment evince a clear legislative intent to create private and enforceable contract rights against the state. *E.g., United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17 n. 14, 97 S.Ct. 1505, 1515 n. 14, 52 L.Ed.2d 92, 106 n. 14 (1977); *Brennan*, 529 A.2d at 638. Moreover, there is a strong presumption against construing a statute to create such contractual obligations, and individuals alleging its creation bear the heavy burden of overcoming this presumption. *E.g., National Railroad Passenger Corp.*, 470 U.S. at 466, 105 S.Ct. at 1451–52,

---

**2.** The contract clauses of the United States and Rhode Island Constitutions prohibit laws that impair the obligation of contracts. *See* U.S. Const., Art. 1, § 10; R.I. Const., art. 1, § 12. Over time, we have adopted the test devised by the United States Supreme Court in scrutinizing alleged contract-clause violations. *See Rhode Island Depositors Economic Protection Corp. v. Brown*, 659 A.2d 95, 106 (R.I.), *cert. denied,* —— U.S. ——, 116 S.Ct. 476, 133 L.Ed.2d 405 (1995); *Brennan v. Kirby*, 529 A.2d 633, 638 n. 7 (R.I. 1987). Generally we look to see whether the

change in law operates as a substantial impairment of a contractual relationship. *Brown*, 659 A.2d at 106. This inquiry has three elements: whether there is a contract, whether the law in question impairs an obligation or a right under that contract, and whether the impairment is substantial. *See id.* But even if the new law constitutes a substantial impairment, it still will not be deemed unconstitutional as a violation of the applicable contract clauses if "it is reasonable and necessary to carry out a legitimate public purpose." *Brennan*, 529 A.2d at 638.

84 L.Ed.2d at 446; *Brennan,* 529 A.2d at 638.

We believe that converting the reemployment opportunities formerly available to these public pensioners into legally enforceable contract rights would "play[ ] havoc with basic principles of contract law, traditional contract clause analysis, and, most importantly, the fundamental legislative prerogative to reserve to itself the implicit power of statutory amendment and modification." *Pineman v. Oechslin,* 195 Conn. 405, 488 A.2d 803, 808 (1985); *see also Fumarolo v. Chicago Board of Education,* 142 Ill.2d 54, 153 Ill.Dec. 177, 200, 566 N.E.2d 1283, 1306 (1990). We think the better approach to gauging the legal status of this type of public-pension benefit is to start with the presumption that it creates no private contractual rights but merely declares legislative policy as of its enactment date. This interpretation accords with the fact that the principal function of the Legislature is to make policy, not to enter into contracts. *See National Railroad Passenger Corp.,* 470 U.S. at 466, 105 S.Ct. at 1451, 84 L.Ed.2d at 446; *Brennan,* 529 A.2d at 638. Policy goals of a legislative body are "inherently subject to revision and repeal, and to construe laws as contracts when the obligation is not clearly and unequivocally expressed" would be to circumscribe drastically the core powers of a legislature. *National Railroad Passenger Corp.,* 470 U.S. at 466, 105 S.Ct. at 1451–52, 84 L.Ed.2d at 446 (adding that " '[t]he continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation' ").

In the determination of whether public-contract rights exist, the most important fact is legislative intent as it is expressed in the language of the statute. *See National Railroad Passenger Corp.,* 470 U.S. at 466, 105 S.Ct. at 1452, 84 L.Ed.2d at 446; *Brennan,* 529 A.2d at 639. Mere reliance by benefited parties on legislative enactments and their unilateral beliefs concerning what the statute will mean to them in the future, no matter how reasonable they may seem at the time, cannot create a legislative intent to establish enforceable contractual rights that is not otherwise manifest in the words of the legislation. *See Pineman,* 488 A.2d at 809. In applying this concept, " 'courts have consistently refused to give effect to government-fostered expectations that, had they arisen in the private sector, might well have formed the basis of a contract or an estoppel.' " *Pineman v. Fallon,* 662 F.Supp. 1311, 1316 (D.Conn.1987), *aff'd,* 842 F.2d 598 (2nd Cir.), *cert. denied,* 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 48 (1988). Thus notions of promissory estoppel that are routinely applied in private contractual contexts are ill-suited to public-contract-rights analysis. *See* 662 F.Supp. at 1316; *see also Pineman,* 488 A.2d at 809.

We believe that private contract analysis should not be applied here because a statutory public-pension benefit scheme like this one is not the kind of "bargained-for-exchange" that is the hallmark of contracts. *See Pineman,* 488 A.2d at 808–09. Therefore, plaintiffs' asserted reliance on the then-existing reemployment-hours cap, in deciding to retire, should not be allowed to convert legislative policy into guaranteed or implied contract rights. Moreover, treating these reemployment benefits as contractual rights would impermissibly tether future Legislatures to past pension policies when they might most need a free hand not only to grapple with changes in the State's financial condition but also to wrestle with new and pressing practical considerations beyond those that reigned supreme when the subject statute was enacted. If reliance alone determined the contractual nature of such legislative enactments, then few if any statutory changes would be permissible in the administration of pension-benefit schemes.

To be sure, "[i]n a universe of inconstancy," [3] "[i]n a world where all is unstable, and nought can endure, but is swept onwards at

---

**3.** Wallace Stevens, "Notes Toward A Supreme Fiction," *in The Collected Poems of Wallace Stevens 380, 389 (Alfred A. Knopf 1969).*

once in the hurrying whirlpool of change,"[4] it is only human nature to "long for a repose that ever is the same."[5] But it is not to be. Even ships of state from time to time need to reshape or remove the policy barnacles encrusted on their hulls. Otherwise, every statute of benefit to some group or individual would remain immutable and forever crystallized in the past as long as one or more beneficiaries could claim reliance thereon. And in this pension context the State would be required to outfit different groups of retirees in a motley garb of sundry reemployment benefits depending on the time and the season of each employee's retirement.

Unfortunately the trial justice steered a different course when he followed the contractual-pension analysis found in a recent decision of the United States District Court for the District of Rhode Island. *See National Education Association–Rhode Island v. Retirement Board of the Rhode Island Employees Retirement System,* 890 F.Supp. 1143 (D.R.I.1995) (the *NEA* case). We respectfully disagree with that approach as applied to these facts. First, unlike the plaintiffs in the *NEA* case, these plaintiffs gave no specific, bargained-for consideration in exchange for the opportunity to be offered a certain number of post-retirement work hours from the State. Because they were not guaranteed this opportunity in the first place, they are not being deprived of any negotiated or promised consideration when the Legislature decides to repeal or to modify this benefit. Second, plaintiffs here are suing to enforce their mere expectation of receiving future reemployment opportunities; they have not been denied any previously offered reemployment, nor are they being asked to forfeit any payments due them for work they have already performed.

In fine, we believe the trial justice erred in placing too much emphasis on these pensioners' asserted reliance on the statutory reemployment scheme as it existed when they retired. There is nothing in that legislation that compels the conclusion that the General Assembly intended such benefits to be contractual. Accordingly, we must presume that no such rights were intended.

■ But even if the pension benefits at issue here could be construed to create contractual rights, there was no evidence presented to the court suggesting that the challenged amendments substantially impaired those rights. Public pensions have always been a heavily regulated legal arena. Therefore, individual expectations of immunity from future statutory change would have been unwarranted even if these provisions were contractual in nature. After all, "[o]ne whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828, 832 (1908) (per Holmes, J.). Here, it is not even clear as a factual matter that the new $10,000 cap on reemployment earnings will actually have an adverse (let alone a *substantially* adverse) impact on all of these plaintiffs' previous earnings under the old part-time hourly reemployment scheme.

Second, even if these retired professors had contract rights to be reemployed by the government and even if the $10,000 annual payment cap on such part-time reemployment constituted a substantial impairment of those rights, their attempt to prevail on an impairment-of-contract theory would still fail because the challenged legislation was both reasonable and necessary to advance the legitimate public purpose of fostering public confidence in the State's retirement system by restricting the proclivity of some public pensioners to indulge in what is colloquially referred to as "double dipping"—that is, the simultaneous receipt by retired public employees of both a salary for state reemployment and a state pension. The 1995 statute limiting the extent of these pensioners' reemployment earnings from the State would serve, among other purposes, to regulate the extent of such double dipping into

**4.** Arthur Schopenhauer, "Vanity of Existence," in *The Will to Live: Selected Writings of Arthur Schopenhauer* 229, 230 (Richard Taylor ed., 1967).

**5.** William Wordsworth, "Ode to Duty," in *Poems of Wordsworth* 193, 194 (Matthew Arnold ed., London, McMillen and Co. 1880).

the public fisc. The General Assembly was entitled to conclude that a practice whereby retired state college or university professors continue to be employed at public institutions of higher learning while receiving a full state pension is inconsistent with the purpose of providing public pensions to such retirees in the first place. Given the presumptive legitimacy of such a legislative purpose, any frustration of the retired professors' reemployment expectations would be not only reasonable but arguably necessary to preserve public confidence in the integrity of this pension scheme.

▮▮▮ In sum, the General Assembly was free to enact retrospective legislation in this situation because, in doing so, it has not impaired any contractual obligations or interfered with any of plaintiffs' vested rights. *Lawrence v. Anheuser–Busch, Inc.*, 523 A.2d 864, 869 (R.I.1987). Legislation of this kind is constitutional if its retroactive application is justified by a rational legislative purpose. *See Prata Undertaking Co. v. State Board of Embalming and Funeral Directing*, 55 R.I. 454, 470–71, 182 A. 808, 815 (1936). Here, for the reasons previously posited, the General Assembly's pension-policy decision is at least passably prudent, if not preeminently politic.

Accordingly, the plaintiffs were not entitled to rely on the presumed permanency of the post-retirement reemployment statutes as they existed before they were recently amended. As nontenured part-time professors who teach on an as-needed basis, the plaintiffs can be hired or rehired according to the discretion of the various state colleges and universities who act as their employers. After the 1994 fall semester, none of these plaintiffs had any future contract guaranteeing reemployment with the State. Thus it can hardly be unconstitutional to hold them to whatever statutory terms may then be in existence if and when they are offered any post-retirement governmental reemployment in the future.

For these reasons we sustain the defendants' appeal, vacate the Superior Court's permanent injunction, and remand this case

with instructions to enter judgment in favor of the defendants.