DECISION
Before this Court is an appeal from an Administrative Hearing Decision (Decision) of the Rhode Island Department of Human Services (DHS), denying the application of Timothy Pelleccione (Pelleccione) for the funding of certain modifications to his home in order to make it wheelchair accessible. This Court has jurisdiction pursuant to G.L. § 42-35-15.
 Facts/Travel
As a result of a diving accident when he was nineteen, Pelleccione has quadriplegia and uses a wheelchair. He has been a client of the DHS Office of Rehabilitative Services (ORS) since 1995. With
ORS help, Pelleccione finished college and became successfully employed as a financial advisor.
In January 1999, Pelleccione wished to purchase a house. He informed the ORS of his intended purchase and that he would need assistance in making the home accessible. Subsequently, Pelleccione purchased a house located at 3 Spicebush Trail in Narragansett. Near the end of March 1999, ORS obtained an Assessment of Home Accessibility on the house from a mobility specialist. The mobility specialist recommended an architectural assessment to determine effective modifications to meet Pelleccione's special needs.
DHS authorized an architectural assessment from its architect, Michael Warner (Warner). Warner suggested both interior and exterior modifications to make the house more accessible. For the exterior modifications, Warner advised Pelleccione of two feasible options for making the entrance wheelchair capable — a ramp or an electric lift. Further, Warner explained to Pelleccione that pursuant to DHS practice, DHS would only help pay for one wheelchair accessible entrance, but not both. In his letter dated May 18, 1999, Warner summarized his findings and recommended the installation of the electric lift.
Citing certain safety concerns, Pelleccione expressed a desire to have both a ramp and a lift. Pelleccione indicated that he was willing to pay for the ramp and for an accompanying deck himself. Warner subsequently created a rough drawing of the property with the proposed modifications (site plan) that included both a ramp and an electric lift. The site plan itself noted that Pelleccione would pay for the ramp, which he would install at a later time. The ORS approved the site plan in late May of 1999.
On June 4, 1999, Pelleccione met with an ORS counselor and executed an Individualized Written Rehabilitation Program (IWRP). The IWRP listed specific objectives concerning Pelleccione's proposed modifications and a timeline for their completion. One entry, entitled "purchase lift," listed an expected completion date of October 1999. These plans were reviewed by ORS and signed by Pelleccione, his ORS counselor, and an ORS supervisor.
Pelleccione moved into his house in the last week of July 1999. Prior to his habitation, he had the permanent ramp and deck installed pursuant to the site plan. To cover the cost of the ramp, Pelleccione took a second mortgage on the property for $15,000. According to his later administrative hearing testimony, he was unable to live in the house without this ramp or a lift.
In a letter dated January 5, 2000, Warner informed ORS of the costs involved in installing an appropriate electric lift on the property. The letter concluded "I recommend the department determine the feasibility of this modification in light of the clients [sic] current needs. When I performed my initial evaluation, the lift was to be the clients [sic] primary means of accessing the residence; a ramp now exists serving that purpose."
Apparently, these two sentences set a chain reaction into motion over the subsequent three weeks. Although the precise sequence of events is not totally clear from the record evidence presented to this Court, after receiving the letter from Warner, ORS Adaptive Housing Coordinator James Madden (Madden) sought to explore alternatives to the installation of the $35,000 lift. The alternative plan that Madden favored included moving the gas tank, furnace, electrical service, washer, and dryer (utilities) from the basement to the first floor. ORS must have let Pelleccione know that it was considering an alternative plan. In a letter dated January 18, Pelleccione reiterated his request for the funding of a lift and expressed his concerns about the proposed alternative. Specifically, this letter stated:
 "On the main floor, the bathroom, bedroom, and kitchen areas have already been modified to support my lifestyle in a wheelchair,.[sic]"
 "I have reviewed the most practical solutions for gaining access to these areas with contractors. The living space on the main floor does not permit for the relocation of the main living appliances . . . . which currently reside in the basement. In order for me to live independently, I need to gain access to these facilities without assistance. This will be made possible through the use of a wheelchair lift to the basement."
Nonetheless, Madden contacted Warner to have him assess the feasibility of relocating the utilities from the basement to the first floor. Warner concluded that moving the washer, dryer, and electrical panel was not only feasible, but with a cost between $5,000 and $6,000, that it was also much cheaper as well. (See Michael Warner's Letter of January 25, 2000.) Further, Warner stressed that the overall accessibility of the home would be better served by moving the utilities, excluding the gas tank and furnace, to the same level as the living space. In Warner's opinion, based on his experience, Pelleccione would not need access to the gas tank and furnace as "this equipment would best be serviced by qualified technicians and not the homeowner." (See Id.) Warner's recommendations became ORS policy on February 1, 2000. (See ORS Memo from Madden, February 1, 2000.)
According to an ORS Inter-Office Memo, the ORS presented its alternative plan to Pelleccione on February 23. Pelleccione objected to this new plan for several reasons. First, Pelleccione claimed that he had made his plans to pay for the ramp and deck based on his understanding that the signed "blue prints"[1] would not be altered. Second, Pelleccione argued that he relied, to his detriment, on the representations made by Warner that "everything would be O.K." Third, Pelleccione expressed (apparently for the first time) a desire to construct an office in the basement, which would not be accessible without the electric lift. Fourth, Pelleccione revealed (apparently for the first time) that he would be unable to convert a bedroom into an area for his electric panel, washer, and dryer, as required by the new plan, because the bedroom was rented to a boarder. Pelleccione reminded the ORS that he had taken a $15,000 second mortgage on the house, and also, apparently, threatened to tear down the ramp and deck that he had constructed in order to get the lift. The Inter-Office Memo further noted that Pellecione's Senior Counselor strongly advocated the approval of the funding citing "confusion over policy."
The same Inter-Office Memo also contained ten (10) reasons for denying the application for the lift. These reasons, quoted verbatim, included:
 "1. Policy states that Functional Occupancy Adaptation is defined as `a housing adaptation which is necessary to enable an individual with a disability to access to the primary living quarters (example, bedroom, bathroom, kitchen and living room areas.' (Section 115.26, II, (3).
 2. Section 115.26 III A `the counselor will make an appraisal of the need for adaption housing services and acquaint the client with Adaptive Housing Policy and it's limitations, including cost and time constraints'.
 3. Section 115.26. C) `Counselor must explain that proceeding with Adaptive Housing Evaluation is not a guarantee that the Agency will participate in the cost of Adaptive Housing'.
 4. The Architectural Consultation and report of 1-25-00 recommends the less expensive relocation of the washer and dryer and electrical panel to the first floor.
 5. When the Architectural plans were drawn up, client did not have a ramp and a deck and said that he would do it at some later date.
 6. Based on a Waiver of Policy we have already paid for $15.000 interior modifications.
 7. Client's oil tank furnace and electrical may be serviced by professionals.
 8. We have never approved two (2) entrance/exits in any Adaptive Housing since I [James Madden] have been the Coordinator (over 10 years).
 9. The lift might significantly add to the resale value of the property. (c.a.)
 10. The agency may suspend or terminate Adaptive Housing Services at anytime. C,2)"
ORS officially denied Pellecione's funding request on March 20.
Thereafter, Pelleccione filed a timely appeal with DHS, which held an administrative hearing on June 12, 2000. At the hearing, both Madden and other ORS representatives admitted that the ORS was aware of Pelleccione's initial desire to have both a ramp and a lift, with the construction of the ramp to be completed at Pelleccione's own expense at a later date. However, Madden further testified that he first learned of the completion of the deck on January 5, 2000, and that in his opinion, this solved the "access/egress matter." Also, Madden testified about attempted compromise agreements, including the alternative plan of relocating some of the utilities and even ORS payment for the ramp and deck that had already been constructed.
During the hearing, Pelleccione again testified that once he saw the "blue prints" for the exterior modifications, he thought that the lift had been approved. Pelleccione further claimed that he did not know of any limits on the amount of funding for the exterior modifications. Instead, Pelleccione testified that he had the ramp built in July because he could not live in the house without a ramp or lift and, in his opinion, the approval process was taking too long. He wanted to inhabit the residence right away because he was paying a mortgage on the property and was under the impression that the lift would be funded. Pelleccione concluded his testimony by explaining the hardship that the lack of an electric lift would produce, submitting two letters from oil distributors indicating the need for Pelleccione to have access to the basement so that he could attend to the furnace and oil tank for maintenance and for emergency reasons.
On September 8, the Administrative Hearing Officer issued a Decision, affirming the ORS decision to deny funding for the electric lift. (DHS Docket No. 00-431). In the Decision, the Hearing Officer made five formal "Findings of Fact." All of these findings related exclusively to matters of Pelleccione's qualifications for ORS funding of the electric lift and to the procedure that he followed in regards to his application for administrative review. However, in the Conclusion, the Hearing Officer applied ORS policy, as well as their past practices, to the relevant testimony. In particular, the Decision noted that the ORS policy is quite detailed regarding the necessary procedures taken before a final approval may be given. Pelleccione did not convince the Hearing Officer of the immediate need which purportedly prompted the construction of the permanent ramp on the property; nor did the Hearing Officer accept Pelleccione's explanation regarding the need to install the lift in order to service the gas tank and furnace. Consequently, the Hearing Officer concluded that Pelleccione himself created many of the obstacles to the ORS's alternative proposal to which he so vehemently objected. Moreover, the Hearing Officer found that Pelleccione changed the focus of the application for the lift from one of access to the house itself to one of accessing the basement to attend to the utilities. ORS policy required the Adaptive Housing Coordinator to approve the contract for the funding for Pelleccione's lift, which Pelleccione had never obtained. Therefore, the Hearing Officer concluded that ORS had followed both policy and past practices in reaching its decision.
Pelleccione filed the instant, timely appeal on November 1. Specifically, Pelleccione now claims that the Decision was erroneous because "(1) [the Hearing Officer's] conclusions were contrary to state and Federal law regarding IWRP development, (2) [the Hearing Officer] failed to account for [Pellecione's] detrimental reliance on [DHS'] representations, (3) [the Hearing Officer's] findings concerning [DHS'] past practice were not supported by substantial evidence, and (4) [the Hearing Officer] abused his discretion."
 Standard of Review
The Administrative Procedures Act, G.L. 1956 § 42-35-15 provides for judicial review of the Dealers' Office's and the Department's decisions by this Court. The Act provides in pertinent part:
 "(g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of witnesses or the weight of evidence concerning questions of fact. Costa v. Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v. R.I. Conflict of Interest Commission, 509 A.2d 453, 458 (R.I. 1986). Therefore, this Court's review is limited to determining whether substantial evidence exists to support the Commission's decision. Newport Shipyard v. Rhode Island Commission for Human Rights, 484 A.2d 893 (R.I. 1984). "Substantial evidence" is that which a reasonable mind might accept to support a conclusion. Id. at 897 (quoting Caswell v. George Sherman Sand Gravel Co., 120 R.I. 1981, 424 A.2d 646, 647 (1981)). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently than the agency. Berberian v. Dept. of Employment Security, 414 A.2d 480, 482 (R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal Resources Management Council, 434 A.2d 266, 272 (R.I. 1981). However, questions of law are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflict of Interest Commission, 509 A.2d at 458. The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public Telecommunications Authority, et al. v. Rhode Island Labor Relations Board, et al.,650 A.2d 479, 485 (R.I. 1994).
 Federal and State Law Considerations
Pelleccione first claims that the DHS Hearing Officer "failed to follow Federal and state law, by failing to require [ORS] to provide the services agreed upon by [his] IWRP."[2] To support his argument, Pelleccione cites 29 U.S.C. § 722 (b)(2)(3), which states:
 "Mandatory components of an individualized plan for employment. Regardless of the approach selected by an eligible individual to develop an individualized plan for employment, an individualized plan for employment shall, at a minimum, contain mandatory components consisting of —
 (A) a description of the specific employment outcome that is chosen by the eligible individual, consistent with the unique strengths, resources, priorities, concerns, abilities, capabilities, interests, and informed choice of the eligible individual, and, to the maximum extent appropriate, results in employment in an integrated setting;
 (B) (i) a description of the specific vocational rehabilitation services that are —
 (I) needed to achieve the employment outcome, including, as appropriate, the provision of assistive technology devices and assistive technology services, and personal assistance services, including training in the management of such services; and
 (II) provided in the most integrated setting that is appropriate for the service involved and is consistent with the informed choice of the eligible individual; and (ii) timelines for the achievement of the employment outcome and for the initiation of the services;
 (C) a description of the entity chosen by the eligible individual . . . . that will provide the vocational rehabilitation services, and the methods used to procure such services;
 (D) a description of criteria to evaluate progress toward achievement of the employment outcome;
 (E) the terms and conditions of the individualized plan for employment, including, as appropriate, information describing —
 (i) the responsibilities of the designated State unit;
 (ii) the responsibilities of the eligible individual, including —
 (I) the responsibilities the eligible individual will assume in relation to the employment outcome of the individual;
 (II) if applicable, the participation of the eligible individual in paying for the costs of the plan; and
 (III) the responsibility of the eligible individual with regard to applying for and securing comparable benefits as described in section 101(a)(8) [ 29 U.S.C. § 721(a)(8)]; and
 (iii) the responsibilities of other entities as the result of arrangements made pursuant to comparable services or benefits requirements as described in section 101(a)(8) [29 U.S.C. § 721(a)(8)]; . . . ."
DHS incorporated these rules into its regulations. See generally Rhode Island Department of Human Services Office of Rehabilitative Services Policy and Procedures Manual Section 115.3 II. B. Further, the DHS regulations provide that the IWRP "serves as an agreement between the eligible individual with a disability . . . and the VR counselor regarding the mutual expectations in the rehabilitative process." See id., Section 115.3 II. A. Pelleccione therefore claims that because the IWRP contains a notation to "purchase lift" and because the ORS had approved the site plan, Federal and state law immutably obligate DHS to this plan.
However, this "agreement" is not unlimited, and the sections cited by Pelleccione are not the only applicable rules. In fact, the IWRP is highly regulated. To be eligible to participate under 29 U.S.C. § 720
et seq., states must submit a plan for vocational rehabilitation services that meets the requirements of the Act to the Rehabilitation Services Administration (RSA) for approval before Federal funds are issued.29 U.S.C. § 721(a)(1). The Act requires the State plan to provide for methods of administration that the RSA finds necessary and proper for the efficient administration of the plan. 29 U.S.C. § 721(a)(6)(A).
RSA promulgated rules pursuant to the Act. See 34 C.F.R. Part 361 (2000). These rules again require that State plans establish rules and procedures that ensure financial accountability within the program. See34 C.F.R. § 361.12. Further, Section 361.50 provides:
 "The State plan must assure that the State unit develops and maintains written policies covering the nature and scope of each of the vocational rehabilitation services . . . . and the criteria under which each service is provided. The policies must ensure that the provision of services is based on the rehabilitation needs of each individual as identified in that individual's IWRP and is consistent with that individual's informed choice. The written policies may not establish arbitrary limits on the nature and scope of vocational rehabilitation services to be provided to the individual. . . . The policies must be developed with the following provisions:
 (d) Authorization of Services. The State unit shall establish policies related to the timely authorization of services, including any conditions under which verbal authorization can be given."
Rhode Island formally accepted the provisions of the Act. See R.I. Gen. Laws §§ 42-12-1 et seq. State law directs the DHS to "cooperate, pursuant to agreements, with the federal government in carrying out the purposes of any federal statutes pertaining to vocational rehabilitation." See R.I. Gen. Laws § 42-12-11. Also, the State law authorizes DHS "to adopt such methods of administration as are found by the federal government to be necessary for the proper and efficient operation of the agreements on plans for vocational rehabilitation and to comply with such conditions as may be necessary to secure the full benefits of the federal statutes." See id.
Subsequently, pursuant to both its Federal and state mandates, DHS promulgated rules and regulations of its own to administer the available vocational rehabilitative funds. See Rhode Island Department of Human Services Office of Rehabilitative Services Policy and Procedures Manual ("Manual"); see, also, Lerner v. Gill 463 A.2d 1352 (R.I. 1983) (holding that if a statute expressly delegates power to interpret and define certain legislation to an agency, regulations promulgated pursuant to that power are legislative rules having the force of law). The Manual defines "Functional Occupancy Adaptation" as "a housing adaptation which is necessary to enable an individual with a disability to have access to the primary living quarters (e.g., bedroom, bathroom, kitchen, and living room areas) in the home where s/he lives, and the ability to attend to personal hygiene, home-making activities and other basic personal needs." Section 115.26 II A (3) (emphasis original). Moreover, the Manual provides that "[t]he counselor should also advise the client that he/she should not sign the contract until he/she has been notified by the Adaptive Housing Coordinator that the contract has been approved for ORS Adaptive Housing Assistance." Section 115.26 III. E. 9. g. ¶ 3. The ORS interprets this paragraph to mean that applicants require final approval from the Adaptive Housing Coordinator before any plans become final and any payments can be made.
In the present case, this Court need look no further than the fact that these written procedures promulgated by the ORS adding extra steps to the process were approved and accepted by the RSA, the Federal agency charged with the supervision and administration of the Federal statute. Pelleccione has not attacked the validity or application of these regulations, which formed the basis of the Hearing Officer's Decision. Instead, Pelleccione challenged the DHS's Decision based upon broad statements of policy contained in the Federal statute regarding the creation of the IWRP. See 29 U.S.C. § 720. By complying with its written, approved regulations, DHS complied with Federal and state law. Therefore, the Hearing Officer's Decision is neither in violation of constitutional or statutory provisions nor in excess of the statutory authority of the agency as described in § 42-35-15(g).
Pelleccione's counsel further claims that the IWRP, once made, is a complete "agreement" that cannot be altered except through methods prescribed in the statute. Pelleccione presents no authority in support of his argument. In fact, many courts that have considered this argument have come to the opposite conclusion. See, e.g., Ferretti v. Com. of Public Welfare, 496 A.2d 437 (Pa.Cmwlth. 1985) (holding that an IWRP was not a contractual agreement binding the state agency, and funding issued pursuant to the IWRP could be reduced or terminated as part of cost containment measures); Murphy v. Office of Voc. Educ. Services,705 N.E.2d 1180 (N.Y. 1998) (holding that under the FRA, when an individual's goals and needs have been defined, the agency may factor in the cost of providing services within the prescribed procedural framework, and rejecting an applicant's claim that a particular rehabilitation program must provide, guarantee or continue until optimal employment is actually secured); Buchanan v. Ives, 793 F. Supp. 361
(D.Me. 1991) (holding that the Rehabilitation Act could not be interpreted to require that, in every case, the client's optimum level of employment be reached); Goldstein v. Office of Voc. Educ. Services,605 N.Y.S.2d 425 (A.D. 3 Dept. 1993) (holding that 29 U.S.C. § 720, which insures that individuals be permitted to actively participate and make meaningful choices regarding their individualized program, does not allow them complete control over their program).
In the present case, there are compelling reasons to allow a deviation from the one-line entry in the IWRP. Other documents, including the site plan and the letters from Warner, indicated that the IWRP did not contain the entire program. Pelleccione made certain promises to the ORS in order to obtain approval for his IWRP; namely, that he would construct the ramp "at a later date." The Hearing Officer concluded that Pelleccione himself unilaterally shifted the focus of the application and failed to comply with its terms, thereby contravening his understanding with the ORS. Pelleccione was obligated to wait for the lift to be installed before constructing the permanent ramp. Otherwise, he was obligated to seek an amendment to his program through the prescribed processes to reflect the changes in his intentions, including his intention to rent rooms to boarders or to build an office in the basement. He was further obligated to follow all applicable ORS policies, including obtaining Madden's signature before the construction plans became final. By his own admission, Pelleccione was at least aware of ORS practice relating to the payment for only one primary means of access. This knowledge did not give him the option of simply choosing the most expensive option. The ORS subsequently offered to pay for the ramp pursuant to its stated, known practice. Pelleccione wanted access to the primary living quarters of the house as defined in the definition of Adaptive Housing Policy, and he currently resides therein. That best evidences that the ORS complied with the "expectations of the parties," as stated in the IWRP purpose section, with regards to the access matter.
 Estoppel
Pelleccione next challenges the Decision on the ground of "estoppel." To support his argument, Pelleccione cites East Providence Credit Union v. Geremia, which defines promissory estoppel as:
 "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of its promise."
239 A.2d 725 (R.I. 1968) (quoting Restatement (First) of Contracts § 90). Subsequently, Pelleccione cites several cases which all state that the "doctrine of equitable estoppel . . . may be applied to a governmental authority as well as a private party when appropriate circumstances and principles so require." See, e.g., Greenwich Bay Yacht Associates v. Brown et al., 537 A.2d 988, 991 (R.I. 1988) (emphasis added).
However, according to Geremia, the doctrine of promissory estoppel is distinguishable from that of equitable estoppel. See id. at 727. The doctrine of "equitable" estoppel is generally applied only to representations made as to facts past or present, while doctrine of "promissory" estoppel is applied to those circumstances wherein one promises to do or not to do something in the future. Id. Because Pelleccione cited to the rule announced in Geremia, his claim must be treated as one based on promissory estoppel. Although many courts combine or confuse the two theories, the difference is important for two reasons. First, the doctrine of promissory estoppel traditionally has been invoked as a substitute for a consideration, rendering a gratuitous promise enforceable as a contract. Id. Thus, an action for promissory estoppel assumes a contractual type of relationship, which, as discussed earlier in this Decision, an IWRP does not create. See Ferretti v. Com. of Public Welfare, 496 A.2d 437 (Pa.Cmwlth. 1985) (holding that an IWRP was not a contractual agreement binding the state agency). Second, a claim for promissory estoppel requires more elements and a more exacting standard than a claim for equitable estoppel when applied against a government entity. It is well-settled that notions of promissory estoppel that are routinely applied in private contractual contexts are ill-suited to public-contract-rights analysis. Romano v. Retirement Bd. of Employees' Retirement System of R.I., 767 A.2d 35, 39 (R.I. 2001); D. Corso Excavating, Inc. v. Poulin, 747 A.2d 994, 1001 (R.I. 2000); Retired Adjunct Professors of the State of R.I. v. Almond, 690 A.2d 1342, 1346 (R.I. 1997). Indeed, the Rhode Island Supreme Court has observed that "courts have consistently refused to give effect to government fostered expectations that, had they arisen in the private sector, might well have formed the basis of a contract or an estoppel." Romano, 767 A.2d at 39 (quoting Retired Adjunct Professors, 690 A.2d 1346).
There are four elements necessary to sustain a promissory estoppel claim. In his brief, Pelleccione incorrectly states that there are only three elements. Paraphrasing Pelleccione's brief, the elements that it includes are defendant's reasonable expectation of reliance, plaintiff's actual reliance, and equity. However, the fact of a promise itself must also be an element of the claim. See B.M.L. Corp. v. Greater Providence Deposit Corp., 495 A.2d 675 (R.I. 1985). In B.M.L., the court stressed that in order to sustain a claim of promissory estoppel, the plaintiff is required to establish the first element; the existence of a clear and unambiguous promise. See id. The terms of the promise must be certain, for there can be no promissory estoppel without a real promise. Id. at 477 (citing Metropolitan Convoy Corp. v. Chrysler Corp., 58 Del. 286, 290, 208 A.2d 519, 521 (1965)). Promissory estoppel cannot be based upon preliminary negotiations and discussions or on an agreement to negotiate the terms of a contract. Id. (citing Keil v. Glacier Park, Inc.,188 Mont. 455, 463, 614 P.2d 502, 506 (1980)). The promise forming the basis of the claim cannot be conditional. Id. at 477-478.
Further, when a court considers a promissory estoppel claim against a governmental authority, there is an additional requirement that the person offering the promise must have actual authority. See Romano, 767 A.2d at 40 (emphasis added); Mancuso v. City of Providence, 685 A.2d 279
(R.I. 1996). "Estoppel against a municipal corporation growing out of affirmative action must be predicated upon the acts or conduct of its officers, agents or official bodies acting within the scope of their authority." (Emphasis added). Romano, 767 A.2d at 41 (quoting Ferrelli v. Department of Employment Security, 106 R.I. 588, 592-93, 261 A.2d 906, 909). Moreover, a person's failure to discover the true scope of a government agent's actual authority will not provide any grounds to relieve that person's detrimental reliance upon the agent's representations or actions. Romano, 767 A.2d at 43. In Romano, the court concluded that to rule otherwise would undermine the integrity and structure of our state government because it would allow every government official to act as his or her own mini-legislature, cashiering those laws he or she dislikes, is ignorant of, or misinterprets, and instead molding the law to be whatever the government official claims it to be. Id.
In the present case, the record does not reflect a "promise" warranting promissory estoppel. As an initial matter, IWRP itself is not the type of "bargained for" exchange that could form the basis of an enforceable contract. See Retired Adjunct Professors, 690 A.2d 1346. Therefore, it is ill-suited to a promissory estoppel analysis. Also, final ORS approval was conditional on Pelleccione's following all ORS regulations. As both Madden and the Hearing Officer concluded, when Pelleccione built the ramp prematurely without Madden's final approval for the lift, he essentially did so in contravention of the ORS's written procedures and at his own peril. He also changed the focus of the application from one of accessing his primary living quarters, as allowed by ORS policy, to one of servicing the utilities. Additionally, terms of the IWRP itself — omitting terms such as cost and failing to specify exactly who would perform the work — are too uncertain to form the basis of an enforceable promise,. Most significantly, according to ORS's written procedures, Madden was the only person who possessed actual authority to grant the final approval for the funds to purchase the lift. Thus, any reliance that Pelleccione placed on acts, representations, or omissions of any other ORS employee, although unfortunate, is neither pertinent nor enforceable.
Likewise, the record evidence does not demonstrate Pelleccione's reliance. "Mere reliance" by benefited parties on legislative enactments and their unilateral beliefs concerning what the statute will mean to them in the future, no matter how reasonable they may seem at the time, cannot create a legislative intent to establish enforceable contractual rights that is not otherwise manifest in the words of the legislation. Retired Adjunct Professors, 690 A.2d 1346. If reliance alone determined the contractual nature of such legislative enactments, then few if any statutory changes would be permissible in the administration of benefit schemes. Id. In Retired Adjunct Professors, the court considered whether retroactive application of a new, more frugal pension system violated a "promise" made by the older, more generous system. There, Justice Flanders eloquently stated:
 "To be sure, `[i]n a universe of inconstancy,' `[i]n a world where all is unstable, and nought can endure, but is swept onwards at once in the hurrying whirlpool of change,' it is only human nature to `long for a repose that ever is the same.' But it is not to be. Even ships of state from time to time need to reshape or remove the policy barnacles encrusted on their hulls. Otherwise, every statute of benefit to some group or individual would remain immutable and forever crystallized in the past as long as one or more beneficiaries could claim reliance thereon. And in this pension context the State would be required to outfit different groups of retirees in a motley garb of sundry reemployment benefits depending on the time and the season of each employee's retirement."
Id. at 1346-1347 (internal citations omitted).
The same may be said of Pelleccione's circumstances. The ORS explained its practice of paying for one means of access. Pelleccione understood that to mean that he would have a choice. Upon that belief, not a promise or an agreement, he borrowed money and installed the ramp. The IWRP could not be construed to mean that the government would pay, regardless of all costs or other eventualities. This interpretation would bind the ORS, with limited resources, to already existing programs and would restrict the funds available for future applicants, outfitting different groups of applicants in a motley garb of sundry rehabilitative benefits. Such reliance, either on the IWRP or oral assurances, is simply not reasonable. Also, the record evidence does not show that Pelleccione's reliance was even detrimental. He is not in a worse position than he would have been if he had never contacted the ORS for assistance, but now has $15,000 worth of home improvements already paid for by the ORS with $21,000 worth of assistance still available.
As for balancing the equities, this Court will simply add that, before this controversy arose, the ORS had already paid for $15,000 worth of interior modifications for the home, well above its ordinary limit. After the controversy arose, the ORS sought to work with Pelleccione, offering him another $15,000 to pay for the ramp, which he unilaterally installed, and to extinguish the mortgage, which he unilaterally incurred. Additionally, the ORS offered Pelleccione another $6,000 to pay for other modifications. Pelleccione made a choice to house boarders, which made alternative plans less attractive to him. Pelleccione threatened to destroy the ramp to obtain funding for the lift. The record reflects that Pelleccione's problems result from his own actions. Thus, this case does not provide a compelling reason to invoke equity.
Pelleccione failed to meet his burdens with respect to establishing a promise running from the ORS to himself, made by a person or entity with actual authority, upon which he could reasonably rely. Accordingly, the DHS's Decision denying the lift is neither in excess of the statutory authority of the agency nor affected by other error of law under §42-35-15(g).
 ORS' Policies and Past Practices
In a one paragraph argument, Pelleccione claims that nothing in the ORS's regulations states that the agency will make only one entrance into the home. Therefore, Pelleccione argues that the Hearing Officer committed an error when he stated that "policy and procedure . . . were followed" in the administrative Decision. Indeed, the parties agree that "one-entrance" mandate is a "past practice," not a policy. Although it is not clear that "past practice" could form the basis of the Decision, such concerns need not be addressed here. The "one-entrance" practice did not form the basis of the Hearing Officer's Decision. Instead, the Hearing Officer explicitly relied on Section 115.26 III. E. 9. g. ¶ 3 of the Manual, which addressed the procedures regarding final approval. Also, although not explicitly, the Hearing Officer extensively addressed the language contained in the definition of Adaptive Housing Services, Section 115.26 II A (3). Because the Hearing Officer based his Decision on established written policies and procedures, it was not in violation of constitutional or statutory provisions, not in excess of the statutory authority of the agency, not made upon unlawful procedure, and not affected by an error or law.
 Substantial Evidence
Pelleccione next argues that the "Hearing Officer made findings . . . which were not supported by substantial evidence." Specifically, he charges that Madden withheld final approval for the lift based on a "past practice" not established or sufficiently defined in the record. He claims that the past practice, as relayed to him from several ORS counselors and admitted in the hearing testimony, explained that the ORS practice was that ORS would only pay for one means of access, not that ORS would only approve one means of access.
Again, in reviewing agency decisions, this Court must give due deference to the decision of the Administrator if it is based upon substantial evidence in the record. Costa v. Registry of Motor Vehicles,543 A.2d 1307, 1309 (R.I. 1988). This Court is precluded from exercising independent judgment on fact and policy and must confine itself to a review of the record to determine if legally competent evidence exists to support the decision. Environmental Scientific Corporation v. Durfee,621 A.2d 200, 208 (R.I. 1993). Legally competent evidence is defined as the presence of "some" or "any" evidence supporting the agency's findings. Sartor v. Coastal Resources Management Council, 542 A.2d 1077, 1082-83 (R.I. 1988). "If competent evidence exists in the record considered as a whole, the court is required to uphold the agency's conclusions." Id. (citing Barrington School Committee v. Rhode Island State Labor Relations Board, 608 A.2d 1126, 1138 (R.I. 1992)).
In the present case, the Hearing Officer had the ability and the authority to determine the existence and scope of the past practices of the agency. Instead, the Hearing Officer believed 20 Madden's testimony regarding the one-entrance practice. Even if this Court accepted, arguendo, that the Hearing Officer's ruling regarding ORS's practices was not supported by substantial evidence, his Decision was not clearly erroneous. There is a completely independent basis on which the Hearing Officer's Decision rests; that being the definition of adaptive housing services itself. Madden denied Pelleccione's approval because, according to evidence in the record, Pelleccione's construction of the ramp provided access to "primary living quarters," thereby "solving the access problem." The Hearing Officer concurred, concluding that Pelleccione changed the focus from one of access permitted by written policy to one that was not. Pelleccione moved into the house in July, 1999 and at all times utilized the ramp for access. Therefore, the Hearing Officer's conclusion that Pelleccione had access to the primary living quarters through the option that Pelleccione himself chose was not arbitrary or capricious and was supported by reliable evidence on the record. Before installation of the ramp, it was not clear that the ramp would satisfy Pelleccione's access needs. Because it has been installed and successfully utilized, Pelleccione cannot effectively contend that he now has an option of choosing a more expensive outcome, as he has tried at both the administrative level, as well as in this Court. Pelleccione's claim that the ramp did not provide effective access because they did not allow him to service the utilities was rejected by the Hearing Officer. The Hearing Officer's ruling regarding the utilities was supported by Madden's testimony and by letters from Warner attached as evidence in the record. Therefore, there is substantial evidence to support the Hearing Officer's Decision.
 Abuse of Discretion
Pelleccione's final argument charges that the Hearing Officer abused his discretion in two ways: first, Pelleccione claims that the Hearing Officer incorrectly took "notice" of the existence of a temporary ramp sufficient to safely meet Pelleccione's access needs, and second, Pelleccione claims that the Hearing Officer erred "by discrediting [Pelleccione's] reasons for wanting access to his heater and hot water system."
The standards for the admissibility of evidence at administrative hearings is dictated by statute.
Section 42-35-10 provides:
 "(a) . . . . The rules of evidence as applied in civil cases in the superior courts of this state shall be followed; but, when necessary to ascertain facts not reasonably susceptible of proof under those rules, evidence not admissible under those rules may be submitted (except where precluded by statute) if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs. . . . Objections to evidentiary offers may be made and shall be noted in the record. Subject to these requirements, when a hearing will be expedited and the interests of the parties will not be prejudiced substantially, any part of the evidence may be received in written form; . . . .
 (d) Notice may be taken of judicially cognizable facts. In addition, notice may be taken of generally recognized technical or scientific facts within the agency's specialized knowledge; but parties shall be notified either before or during the hearing, or by reference in preliminary reports or otherwise, of the material noticed, including any staff memoranda or data, and they shall be afforded an opportunity to contest the material so noticed."
In administrative proceedings, uncontradicted testimony may not be rejected arbitrarily. Lombardo v. Atkinson-Kiewit, 746 A.2d 679 (R.I. 2000); Hughes v. Saco Casting Co., 443 A.2d 1264 (R.I. 1982). However, such testimony "may be rejected if it contains inherent improbabilities or contradictions that alone or in connection with other circumstances tend to contradict it. Such testimony may also be disregarded on credibility grounds as long as the factfinder clearly but briefly states the reasons for rejecting the witness' testimony." Lombardo, 746 A.2d at 688. (quoting Correia v. Norberg, 120 R.I. 793, 391 A.2d 94 (1978)). Further, evidence admitted without objection must be considered and given its natural probative effect as if it were admissible in law. Correia,120 R.I. 793, 801, 391 A.2d 94, 98 (citing Diaz v. United States,223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500 (1912)). For example, oral testimony admitted without objection, even assuming it is entirely hearsay, must be given full probative effect. See id.
Pelleccione claims that the Hearing Officer took improper "notice" of the existence of a temporary ramp. However, the Administrative Hearing Decision reveals otherwise where it states, in pertinent part:
 "[Pelleccione] testified that he could not gain access into his home and needed to build his ramp and deck and then chose to build a ramp and deck so as to gain access into his home before final approval for a lift was given. This testimony by [Pelleccione] as to needing immediate access into his home and building the ramp and deck is contradictory to information contained in States exhibit # 5 [Letter from Michael Warner, Dated May 18, 1999], the last line of paragraph two being, `a temporary ramp has been installed at the front door.' It is apparent that [Pelleccione] had a means of access/egress to his home. It is the opinion of this Hearing Officer that [Pelleccione] could have gained access to the main living area using the temporary ramp that was already in place as States exhibit 5 indicated. . . ." (emphasis added).
In short, this conclusion is not a judicially noticed fact. Instead, this passage can only be considered a conclusion based on the evidence, despite Pelleccione's argument that the use of the word "opinion" somehow renders it "judicially noticed." Pelleccione had both the opportunity and the burden to challenge this fact at the hearing. Further, Pelleccione had the opportunity to raise these concerns through a post-hearing memorandum. However, Pelleccione's counsel never objected to the admissibility of the letter from Warner. Moreover, Pelleccione did not offer any contradictory evidence disputing the fact a safe temporary ramp was in place when he moved into residence two months later.[3] These two facts make the letter uncontradicted evidence of the existence of the ramp which must be given full probative effect. Section 42-35-10
subsection (a) controls, not subsection (d). Thus, this conclusion of the Hearing Officer did not constitute an abuse of discretion.
Pelleccione's also argues that the Hearing Officer abused his discretion in judicially noticing Pelleccione's reasons for wanting access to his basement. He asserts that the Hearing Officer "disregarded [his] testimony and evidence and determined that [he] wanted access to [the] boiler and hot water system only `in the case of an emergency.'" Further, Pelleccione asserts error in the Hearing Officer's conclusion that the servicing of furnaces and water heaters is best left to trained professionals. In fact, Pelleccione testified that he sought access to the furnace and the water heater because he wished to conserve money on house calls dealing with problems that he could easily fix himself. Also, Pelleccione argues that he did submit evidence, in the form of two letters from oil distributors, explaining the need for Pelleccione to access the basement.
However, there is also evidence in the record to support the Hearing Officer's Decision. One of the letters submitted by Pelleccione himself provides some support. It states "[Pelleccione] may also be asked to shut off the unit until a service person can get there, in the event it were smoking and filling the basement with smoke. . . . Access to the basement, from a safety standpoint is very important." Letter from Kevin Mulholland, Pier Fuel Inc., dated June 7, 2000. Warner also wrote that, in his experience, "it would not be necessary for the client to have access to the oil tank or furnace as this equipment would best be serviced by qualified technicians and not the homeowner." Letter from Michael Warner, dated January 25, 2000. Further, in his opinion, "access to the basement in this case would not be considered an essential element of Independent Living and therefore unnecessary." Id. Again, the Hearing Officer's conclusion does not fit comfortably into a "notice" argument. The Hearing Officer did have probative evidence before him to conclude that there was a potential safety issue involved in granting Pelleccione access to his basement. Thus, the Hearing Officer's conclusion did not constitute an abuse of discretion.
Furthermore, the Hearing Officer's Decision is not dependent on this conclusion regarding safety. Whether Pelleccione wanted access to save money on service calls or whether Pelleccione needed access in case of an emergency is not the issue here in controversy. At issue before the agency was whether the basement is considered a "primary living quarter" included in the definition of adaptive housing services in the Agency's Policy Manual and whether Pelleccione obtained the necessary approvals.
Because the Hearing Officer's factual conclusion regarding Pelleccione's desire for basement access was supported by reliable, probative, and substantial evidence, and was not clearly erroneous, it did not constitute an abuse of discretion.
 Conclusion
After review of the entire record, this Court finds that the decision of the DHS is supported by reliable, probative, and substantial evidence and is not affected by error of law or an abuse of discretion. Substantial rights of Pelleccione have not been prejudiced. This Court therefore denies Pelleccione's appeal and sustains the decision of the Department of Human Services.
Counsel shall submit the appropriate judgment for entry.
[1] At some point in the proceedings, the parties ceased to use the phrase "site plan" and apparently substituted the phrase "blue prints."
[2] The IWRP was the term used in Federal law prior to a 1998 amendment in the Act, which renamed the IWRP as an "Individual Plan for Employment" or "IPE." See 29 U.S.C. § 722 (b) (1998). For the purposes of this Decision, the two terms can be considered interchangeable.
[3] As part of this argument, Pelleccione's counsel also asserts that there was no evidence before the Hearing Officer to suggest that the temporary ramp complied with "State and Federal building and safety codes." This may have been a valid argument if pursued during the hearing, and it certainly would be relevant to the access issue. However, as the party challenging the adverse administrative ruling, Pelleccione and not the ORS carried the burden on this issue. There is no mention of this argument in the record, nor is there any evidence to support it. Therefore, this argument is not subject to review on appeal.